## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S DISTRICT COURT E.D.N.Y

★ APR 0 1 2009 ★

BROOKLYN OFFICE

| | |
|---|---|
| PRESTIGE GROUP, INC. ) | |
| ) | |
| **Plaintiff,** ) | **Case No.** |
| ) | |
| v. ) | **09   1357** |
| ) | |
| HENDERSON HILL ADULT HOME & ASSISTED ) | |
| LIVING PROGRAM, INC., ANNA ERIKA HOME ) | |
| FOR ADULTS ASSOCIATES, JOSEPH P. CILLO, ) | |
| PETER DECHOWITZ, PHILIP B. EMMA, ) | |
| ANGELO SERVIDEO, JOSEPH F. SIRANGELO, ) | VITALIANO, J. |
| VINCENT SIRANGELO, ISLAND MANOR, INC., ) | |
| BAYWOOD, LLC,   WILLY BEER, CHARLES ) | |
| SCHARF and DANIEL STERN, ) | POHORELSKY, M.J. |
| ) | |
| **Defendants** ) | |

## COMPLAINT
### (Jury Trial Demanded)

*Synopsis*

**ANNA ERIKA HOME FOR ADULTS ASSOCIATES,** a general partnership, operated a proprietary adult home at 110 Henderson Avenue, Staten Island, New York, through its successor or alter ego, **HENDERSON HILL ADULT HOME & ASSISTED LIVING PROGRAM, INC.** On October 10, 2001, it engaged the services of **PRESTIGE GROUP, INC.,** as Broker, on an exclusive basis, to find a buyer, ready, willing and able to purchase the assets of that proprietary adult home. **PRESTIGE** located such a buyer in the persons of **WILLY BEER** and **CHARLES SCHARF,** who, together owned **ISLAND MANOR, INC.,** and, subsequently **BAYWOOD, LLC. PRESTIGE's** efforts resulted in a **Purchase Agreement** between the parties, executed on February 13, 2003, which provided for a sale of the assets at a price of $9,000,000.00. Thereafter, the parties, through a series of assignments, management and side agreements, effectuated an actual sale of the assets, by exchanging transfer of possession and control of the assets for $650,000.00 in cash and monthly payments of, initially $71,296.30, then $100,000.00, while refusing to pay **PRESTIGE** its commissions for bringing the sale about. In this complaint, the Plaintiff seeks to redress these grievances through claims of breach of contract ,breach of fiduciary duty, conversion, fraud, constructive trust, unjust enrichment and tortious interference.

## TABLE OF CONTENTS

I      **THE PARTIES**
[¶'s 1-14]

II     **JURISDICTION AND VENUE**
[¶'s 15-17]

III    **RETENTION OF PRESTIGE AS BROKER**
[¶'s 18-37]

IV    **THE PURCHASE AGREEMENT**
[¶'s 38-45]

V     **ASSIGNMENTS AND SIDE AGREEMENTS**
[¶'s 46-56]

VI    **RELEASE OF ESCROW AND PAYMENT OF SALE CONSIDERATION**
[¶'s 57-67]

VII   **DEMANDS FOR ACCOUNTING AND PAYMENT**
[¶'s 68-71]

**FOR A FIRST CLAIM FOR RELIEF**
Breach of Contract (ANNA ERIKA, HENDERSON HILL, CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J and SIRANGELO)
    [¶'s 72-76]

**FOR A SECOND CLAIM FOR RELIEF**
Breach of Agency (ANNA ERIKA, HENDERSON HILL, CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J and SIRANGELO)
    [¶'s 77-84]

**FOR A THIRD CLAIM FOR RELIEF**
Conversion (ANNA ERIKA, HENDERSON HILL, CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J and SIRANGELO)
    [¶'s 85-88]

**FOR A FOURTH CLAIM FOR RELIEF**
Actual Fraud (ANNA ERIKA, HENDERSON HILL, CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J and SIRANGELO)
    [¶'s 89-99]

**FOR A FIFTH CLAIM FOR RELIEF**
**Constructive Fraud (ANNA ERIKA, HENDERSON HILL, CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J and SIRANGELO)**
[¶'s 100-104]

**FOR A SIXTH CLAIM FOR RELIEF**
**Constructive Trust (ANNA ERIKA, HENDERSON HILL, CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J and SIRANGELO)**
[¶'s 105-111]

**FOR A SEVENTH CLAIM FOR RELIEF**
**Unjust Enrichment (MANOR, BAYWOOD, BEER, SCHARF and STERN)**
[¶'s 112-116]

**FOR AN EIGHTH CLAIM FOR RELIEF**
**Tortious Interference With Contract (MANOR, BAYWOOD, BEER, SCHARF and STERN)**
[¶'s 117-130]

**PRAYER FOR RELIEF**
[Pages 36-38]

## EXHIBITS

A.   **Exclusive Listing Agreement** made as of October 10, 2001
B.   **First Extension** of the **Exclusive Listing Agreement** made as of April 15, 2002
C.   **Second Extension** of the **Exclusive Listing Agreement** made as of September 23, 2002
D.   **Purchase Agreement** made as of February 13, 2003
E.   **Personal Guaranty** dated as of February 13, 2003
F.   **Modification** dated as of February 14, 2003
G.   **Proposed Bill of Sale**
H.   **Consent to Assignment of Lease** dated as of July 2, 2003
I.   **Management Services Agreement** dated as of June 16, 2003
J.   **Management Agreement** dated as of June, 2003
K.   **Fee Agreement** made on July 2, 2003
L.   **Amended Purchase Agreement** dated June 26, 2006
M.   **Assignment and Assumption Agreement** effective June 26, 2006
N.   **Side Agreement** dated June 26, 2006

# I
## THE PARTIES

1.    Defendant, **HENDERSON HILL ADULT HOME & ASSISTED LIVING PROGRAM, INC.**, [sometimes hereinafter referred to as **"HENDERSON HILL"**] is a corporation organized and existing under the laws of the State of New York and a citizen of that State, which has a principal place of business in Richmond County.

2.    Defendant, **ANNA ERIKA HOME FOR ADULTS ASSOCIATES** [sometimes hereinafter referred to as **"ANNA ERIKA "**] is a general partnership organized and existing under the laws of the State of New York and a citizen of the States of which its general partners are citizens, to wit, Florida and New Jersey, which has a principal place of business in Richmond County.

3.    Defendant, **JOSEPH P. CILLO** [sometimes hereinafter referred to as **"CILLO"**] is a general partner of **ANNA ERIKA**; and, a citizen and resident of the State of Florida, residing at 8026 Greenside Lane, Bayonet Point, in Pasco County.

4.    Upon information and belief, Defendant, **PETER DECHOWITZ** [sometimes hereinafter referred to as **"DECHOWITZ"**] is a general partner of **ANNA ERIKA**; and, a citizen and resident of the State of New York, residing at 3958 Nostrand Avenue, Apt. 2, Brooklyn, in Kings County.

5.    Defendant, **PHILIP B. EMMA** [sometimes hereinafter referred to as **"EMMA"**] is a general partner of **ANNA ERIKA**; and, a citizen and resident of the State of New Jersey, residing at 16 Cori Street, Parlin, in Middlesex County.

6.    Defendant, **ANGELO SERVIDEO** [sometimes hereinafter referred to as "SERVIDEO"] is a general partner of **ANNA ERIKA;** and, a citizen and resident of the State of New Jersey, residing at 210 Copeland Avenue, Lyndhurst, in Bergen County.

7.    Defendant, **JOSEPH F. SIRANGELO** [sometimes hereinafter referred to as "SIRANGELO-J"] is a general partner of **ANNA ERIKA;** and, a citizen and resident of the State of New Jersey, residing at 412 Cator Avenue, Jersey City, in Hudson County.

8.    Defendant, **VINCENT SIRANGELO** [sometimes hereinafter referred to as "SIRANGELO"] is a general partner of **ANNA ERIKA;** and, a citizen and resident of the State of New Jersey, residing at 218 Old Mill Road, Freehold, in Monmouth County.

9.    Defendant, **ISLAND MANOR, INC.** [sometimes hereinafter referred to as "MANOR"] is a not-for-profit corporation organized and existing under the laws of the State of New York and a citizen of that State, which has a principal place of business in Richmond County.

10.    Defendant, **BAYWOOD, LLC**, [hereinafter referred to as "**BAYWOOD**"] is a limited liability company organized and existing under the laws of the State of New York and a citizen of and a citizen of the States of which its members are citizens, to wit, New York, which has a principal place of business in Richmond County.

11.    Defendant, **WILLY BEER** [sometimes hereinafter referred to as "**BEER**"] is a citizen and resident of the State of New York, residing at 1200 East 8th Street, Brooklyn, in Kings County.

12.    Defendant, **CHARLES SCHARF** [sometimes hereinafter referred to as "SCHARF"] is a citizen and resident of the State of New York, residing at 953 East 22nd Street, Brooklyn, in Kings County.

13.     Upon information and belief, Defendant, **DANIEL STERN** [sometimes hereinafter referred to as "STERN"] is a citizen and resident of the State of New York, residing at 89 Avenue U, in Kings County.

14.     Plaintiff, **PRESTIGE GROUP, INC.** [sometimes hereinafter referred to as "**PRESTIGE**"] is a corporation organized and existing under the laws of the State of Pennsylvania and a citizen of that State, with a principal place of business at 321 S. Valley Forge Road, Devon, in Chester County.

## II
## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this matter pursuant to **28 U.S.C. §1332(a)(1),** as an action based upon diversity of citizenship.

16.     The amount in controversy, exclusive of interest and costs, exceeds the sum of $75,000.00.

17.     Venue is founded in the Eastern District of New York pursuant to **28 U.S.C. §1391(a)(2),** as the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## III

## RETENTION OF PRESTIGE AS BROKER

18.     At all times hereinafter mentioned, **CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J** and **SIRANGELO** were the general partners of **ANNA ERIKA.**

19.     On or about January 30, 1976, **CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J** and **SIRANGELO,** as general partners of **ANNA ERIKA,** as Tenant, entered into a certain written lease [sometimes hereinafter referred to as the "**Lease**"] with

**BROADMOOR ENTERPRISES CORP.,** [sometimes hereinafter referred to as "**BROADMOOR**"] as Landlord, for the premises known as 110 Henderson Avenue, Staten Island, New York [sometimes hereinafter referred to as the "**Premises**"] said Premises being located within the Eastern District of New York.

20. From and after January 30, 1976, the **Premises** were improved to contain a proprietary home for adults containing 427 beds.

21. The **Lease** was assigned by **BROADMOOR** to **HILMOOR ASSOCIATES,** [sometimes hereinafter referred to as "**HILMOOR**"] by agreement made on or about August 29, 1980.

22. From in or about January, 1976, until in or about June, 1998, **ANNA ERIKA** operated a proprietary adult home at the **Premises**.

23. The **Lease** was renewed by a Renewal Agreement made on or about January 25, 1996.

24. On or about October 27, 1997, **ANNA ERIKA** secured authorization from the New York State Department of Social Services to operate a six (6) person adult day care program at the **Premises**.

25. The **Lease** was amended by an Amendment Agreement made on or about November 2, 1997.

26. **HENDERSON HILL** was formed on May 6, 1998, under the laws of the State of New York as a domestic business corporation.

27. Upon information and belief, **HENDERSON HILL** was, and still is, owned and controlled by the general partners of **ANNA ERIKA**.

services business and assets of **HENDERSON HILL** operated at the **Premises** [sometimes hereinafter referred to as the "**Facility**."] A true, correct and complete copy of the **Exclusive Listing Agreement** is annexed hereto as **Exhibit "A"** and made a part hereof.

    35.    Pursuant to the express terms of the **Exclusive Listing Agreement**:

    A.    "Broker is acting as Seller's agent."

    B.    "Broker and Seller have agreed the fee that Seller will pay Broker is 3% of/from the sale price and paid by Seller." [sometimes hereinafter referred to as the "**Broker's Fee**."]

    C.    "Seller must pay **Broker's Fee** if the Business, or any ownership interest in it, is sold or exchanged during the length or term of this Contract by Broker, Broker's agents, Seller, or any other person or broker, at the listed price or any other price acceptable to Seller."

    D.    "Seller will pay **Broker's Fee** if negotiations that are pending at the Ending Date of this Contract result in a sale."

    36.    The **Exclusive Listing Agreement** was extended by written agreement made as of April 15, 2002 to provide the Ending Date was changed to October 15, 2002. [sometimes hereinafter referred to as the "**First Extension**."] A true, correct and complete copy of the **First Extension** is annexed hereto as **Exhibit "B"** and made a part hereof.

    37.    The **Exclusive Listing Agreement** was extended again by written agreement made as of September 23, 2002 to provide the Ending Date was changed to October 15, 2003 [sometimes hereinafter referred to as the "**Second Extension**."] A true, correct and complete copy of the **Second Extension** is annexed hereto as **Exhibit "C"** and made a part hereof.

IV

## THE PURCHASE AGREEMENT

38.   **MANOR**, was formed on December 11, 2001, under the laws of the State of New York as a domestic not-for-profit corporation.

39.   **BEER** and **SCHARF** were members of and controlled **MANOR** at all times hereinafter mentioned.

40.   **PRESTIGE** introduced **MANOR**, **BEER** and **SCHARF** to **ANNA ERIKA** and **HENDERSON HILL** during the term of the **Exclusive Listing Agreement** as extended.

41.   By written agreement made as of February 13, 2003, **HENDERSON HILL** as the successor in interest to **ANNA ERIKA**, as Seller, agreed to sell the assets of the private proprietary adult home and ancillary services theretofore operated by **ANNA ERIKA** at the **Premises** to **MANOR**, its successors and/or assigns, as Purchaser [sometimes hereinafter referred to as the "**Purchase Agreement**."] A true, correct and complete copy of the **Purchase Agreement**, exclusive of the attachments to same, is annexed hereto as **Exhibit "D"** and made a part hereof.

42.   **BEER** and **SCHARF** each gave an express written unconditional guaranty of the payment of the purchase price required by the **Purchase Agreement**, with certain express limitations [sometimes hereinafter referred to as the "**Personal Guaranty**."] A true, correct and complete copy of the **Personal Guaranty**, exclusive of the attachments to same, is annexed hereto as **Exhibit "E"** and made a part hereof.

43.   By written agreement made as of February 14, 2003, the **Purchase Agreement** was amended to provide that "Upon initial licensure, if there is a permanent licensure reduction below 300 adult home beds and/or 122 Assisted Living Person "ALP" beds, Purchaser may cancel this

Page 11 of 38

contract" [sometimes hereinafter referred to as the "**Modification**."] A true, correct and complete copy of the **Modification**, exclusive of the attachments to same, is annexed hereto as **Exhibit "F"** and made a part hereof.

44.    Pursuant to the express terms of the **Purchase Agreement**:

A.    Article 1(a), sub-paragraphs i. through xvi described with particularity the assets of the Seller to be purchased [sometimes hereinafter referred to as the "**Purchased Assets**."]

B.    Article 2.1 provided the purchase price for the **Purchased Assets** was $9,000,000.00 [sometimes hereinafter referred to as the "**Purchase Price**."]

C.    Article 2.2 provided the **Purchase Price** was to be allocated $8,985,000.00 to the "Leaseholds, Service Agreement, machinery, equipment, supplies, bedding, fixtures and leasehold improvements relating to the **Premises**, the trade name '**HENDERSON HILL ADULT HOME ALP INC.**,' and/or '**ANNA ERIKA HOME FOR ADULTS**,' and its variations, Goodwill, the residents list, the telephone and fax numbers, to the extent they are transferrable, insurance policies, permits, licenses, and letters of approval... contract rights, general intangibles relating to the **Premises** and **Facility**;" and $15,000.00 to inventory.

D.    Article 3.1 provided, *inter alia*, that the **Purchase Price** was to be paid (a) $250,000.00 upon the execution of the **Purchase Agreement**, same to be held in an interest bearing escrow account until the Closing, [sometimes

hereinafter referred to as the "**Escrow**;"] (b) $1,050,000.00 at the Closing; and (c) monthly payments of $71,296.30 for a period of 108 months.

E.   Article 5.1 provided, *inter alia*, that the Closing under the **Purchase Agreement** [sometimes hereinafter referred to as the "**Closing**"] "shall take place at 10:00 A.M. on either the last day of the month in which the State of New York Department of Health grants its approval to the Purchasers application for licenses..., or the last day of the month directly following the month that the State of New York Department of Health grants its approval to the Purchaser's license application."

F.   Article 5.1 further provided, *inter alia*, that at the **Closing** the Seller would provide the Purchaser with (a) a Bill of Sale [sometimes hereinafter referred to as the "**Bill of Sale**;"] (b) a duly executed Lease Assignment and Assumption, assigning the **Lease**, as amended, between **HILMOOR** and **HENDERSON HILL** f/k/a **ANNA ERIKA** from **HENDERSON HILL** to **MANOR**.

G.   Article 11 provided, *inter alia*, that "This Contract may be assigned without the written consent of Seller, to a newly formed entity, provided that **BEER** and/or **SCHARF** are principals of the new entity;" and "If the Purchaser sells its' majority interest in the **Facility**, the purchase price of this Agreement and any other amounts due and payable to the Seller shall be due in  its entirety immediately on the closing of said transaction. Provided however, the Seller

may, in its discretion, agree to a longer time period in which to accept any
amounts due and payable."

H.    Article 12 provided, *inter alia*, that "The parties represent to each other that
they have dealt with no broker or finder with respect to the Agreement,
except for **PRESTIGE**...the Seller and **PRESTIGE** have entered into a
separate agreement pursuant to which the Seller shall be obligated to pay
**PRESTIGE** the **Broker's Fee** in relationship to this transaction.

45.    Annexed to the **Purchase Agreement** was a proposed **Bill of Sale**. A true, correct
and complete copy of the **Bill of Sale**, exclusive of the attachments to same, is annexed hereto as
**Exhibit "G"** and made a part hereof.

V

**ASSIGNMENTS AND SIDE AGREEMENTS**

46.    By written Consent to Assignment of Lease dated as of July 2, 2003, **HILMOOR**
consented to the assignment of the **Lease**, as amended, from **HENDERSON HILL** f/k/a **ANNA
ERIKA** to **MANOR**, [sometimes hereinafter referred to as the "**Consent to Assignment of Lease**."]
A true, correct and complete copy of the **Consent to Assignment of Lease**, is annexed hereto as
**Exhibit "H"** and made a part hereof.

47.    On or about June 16, 2003, **HENDERSON HILL**, as Operator, entered into a written
Management Services Agreement with **MANOR**, as Manager, pursuant to which **MANOR** was
engaged by **HENDERSON HILL** to manage the **Facility** at the **Premises** commencing on July 1,
2003; [sometimes hereinafter referred to as the "**Management Services Agreement**."] A true,

correct and complete copy of the **Management Services Agreement**, is annexed hereto as **Exhibit "I"** and made a part hereof.

48.    In or about June, 2003, **HENDERSON HILL**, as Seller, entered into a written Management Agreement with **MANOR**, as Purchaser, [sometimes hereinafter referred to as the "**Management Agreement**."] A true, correct and complete copy of the **Management Agreement**, is annexed hereto as **Exhibit "J"** and made a part hereof.

49.    Pursuant to the express terms of the **Management Agreement**:

A.    Paragraph 1 provided, *inter alia*, that, "effective July 1, 2003 (the "Exercise Date") the Seller will grant the Purchaser the managing rights of the Business. Said rights will include, but not be limited by, the right to make all operational decisions, receive all profits, and be responsible for all expenses in the full daily operation of the **Premises** "

B.    Paragraph 2 provided, *inter alia*, that, "Purchaser will pay Seller $650,000.00 on the "Exercise Date by releasing the $250,000.00 **Escrow** held in accordance with the **Purchase Agreement**, and the balance by check. Said payment will reduce the payment due by Purchaser at the closing by $650,000.00."

C.    Paragraph 3 provided, *inter alia*, that, "Additionally, the Purchaser will make monthly payments to the Seller of $71,296.30, Starting August 15, 2003. The purchase price due by Purchaser will similarly be reduced by the monthly payments made Purchaser under this agreement."

50.     Upon information and belief, the monthly payments of $71,296.30 provided for in Paragraph 3 of the **Management Agreement** commenced being made by **BAYWOOD** to **HENDERSON HILL**, as successor to **ANNA ERIKA** on or about August 15, 2003.

51.     By written agreement made on July 2, 2003, **HENDERSON HILL** t/a **ANNA ERIKA** confirmed the **Exclusive Listing Agreement** with **PRESTIGE** and that **PRESTIGE** was to receive a **Broker's Fee** of $250,000.00 [sometimes hereinafter referred to as the "**Fee Agreement**."] A true, correct and complete copy of the **Fee Agreement**, is annexed hereto as **Exhibit "K"** and made a part hereof.

52.     Pursuant to the express terms of the **Fee Agreement**, the sum of $50,000.00 was placed in an escrow account established at the Royal Bank of Pennsylvania [sometimes hereinafter referred to as the "**Escrowed Amount**"] and the **Escrowed Amount** was to be released, together with the remaining $200,000.00, to **PRESTIGE**, "at the time of final settlement and sale of assets."

53.     **BAYWOOD**, was formed on June 12, 2003, under the laws of the State of New York as a domestic limited liability company.

54.     **BEER** and **SCHARF** were members of and exclusively controlled **BAYWOOD** from between June 12, 2003 and June 26, 2006.

55.     At all times hereinafter mentioned, **BAYWOOD**'s address for service of New York Department of State process, was and still is, c/o **ANNA ERIKA** at the **Premises**

56.     Some time between June 12, 2003 and June 26, 2006, **MANOR**, assigned and/or otherwise conveyed its' contract rights in the **Purchase Agreement** to **BAYWOOD**, with the knowledge and consent of **HENDERSON HILL** and **ANNA ERIKA**.

Page 16 of 38

# VI

## RELEASE OF ESCROW AND PAYMENT OF SALE CONSIDERATION

57.     On June 26, 2006, **HENDERSON HILL**, as Seller, entered into a written agreement with **BAYWOOD**, as Purchaser, [sometimes hereinafter referred to as the "**Amended Purchase Agreement**,"] which expressly referred to and modified the **Purchase Agreement**. A true, correct and complete copy of the **Amended Purchase Agreement**, is annexed hereto as **Exhibit "L"** and made a part hereof.

58.     Pursuant to the express terms of the **Amended Purchase Agreement**:

    A.     Paragraph 1 provided, *inter alia*, that, "Seller hereby consents to the transfer without any restrictions whatsoever by Purchaser of Purchaser's rights and obligations under the **Purchase Agreement**, to either another entity (subject to DOH approval) or through a transfer of the membership interests and/or control of **BAYWOOD**."

    B.     Paragraph 4 provided, *inter alia*, that, "Purchaser agrees that any assignment of the **Purchase Agreement** as contemplated herein, will contain a clause stating that if Purchaser's Assignee fails to obtain DOH approval before December 31, 2006, said assignment will be automatically cancelled, and Purchaser shall be free to assign the **Purchase Agreement** to another assignee, unless Purchaser grants an extension to the original assignee."

    C.     Paragraph 5 provided, *inter alia*, that, "At the **Closing**, the amount due will be $1,300,000.00 of which $650,000.00 were already released to Seller, and $650,000.00 will be given as a cash payment at the **Closing**; plus monthly

Page 17 of 38

payments of $100,000.00 until and including June 2012, which payments include interest and expenses."

59.    Upon information and belief, the monthly payments provided for in Paragraph 5 of the **Amended Purchase Agreement** have been and continue to be made by **BAYWOOD** to **HENDERSON HILL**, as successor to **ANNA ERIKA**.

60.    By Assignment and Assumption Agreement made effective June 26, 2006, **BEER** and **SCHARF**, as Assignor, assigned to **STERN**, as Assignee, all of Assignor's membership interests in **BAYWOOD**, [sometimes hereinafter referred to as the "**Assignment and Assumption Agreement**."] A true, correct and complete copy of the **Assignment and Assumption Agreement**, is annexed hereto as **Exhibit "M"** and made a part hereof.

61.    Pursuant to the express terms of the **Assignment and Assumption Agreement**:

A.    Express reference was made to the **Purchase Agreement** and a copy of same was annexed.

B.    Express reference was made to the "**Amended Purchase Agreement** and a copy of same was annexed.

C.    Paragraph 1 provided, *inter alia*, that, "The recitals set forth above are incorporated in this Agreement as if more fully set forth herein at length."

D.    Paragraph 2 provided, *inter alia*, that, "Assignor hereby assigns, transfers, and conveys to Assignee, subject to the Department of Health's approval of Assignee's application, all of Assignor's right, title, and interest in and to the Membership Interests."

E.    Paragraph 3 provided, *inter alia*, that, "Assignee hereby (a) accepts the assignment, transfer and conveyance of all of Assignor's right, title, and

Page 18 of 38

interest in and to the Membership Interests (b) assumes and agrees to perform and fulfill all of Assignor's covenants and obligations under the **Purchase Agreement**, including, without limitation, the obligation to promptly apply for the necessary governmental approvals, and make all payments due to or payable on behalf of Seller when due and payable; and (c) agrees to be bound by those covenants and obligations. "

F.     Paragraph 5 provided, *inter alia*, that, "Except as modified in this Assignment, all terms of the **Purchase Agreement** remain in full force and are binding on Seller, Purchaser, Assignor and Assignee.

62.     **SIRANGELO** and **STERN** entered into a written Agreement made on June 26, 2006, [sometimes hereinafter referred to as the **"Side Agreement."**] A true, correct and complete copy of the **Side Agreement**, is annexed hereto as **Exhibit "N"** and made a part hereof.

63.     Pursuant to the express terms of the **Side Agreement**:

A.     Paragraph 1 provided, *inter alia*, that, "Upon assuming control of **BAYWOOD** and obtaining DOH approval, **STERN** agrees to pay $30,000.00 per month to **SIRANGELO ENTERPRISES** until and including June 2012. This is in addition to the monthly payment of $100,000.00 made by **BAYWOOD** to **HENDERSON HILL**."

64.     Pursuant to the express terms of Article 11 of the **Purchase Agreement**, the transfer of a majority interest in the **Facility**, as effectuated by the entry of **BEER** and **SCHARF** into the **Assignment and Assumption Agreement**, with the express consent of **HENDERSON HILL** and **ANNA ERIKA** through the **Amended Purchase Agreement**, was to accelerate **HENDERSON**

**HILL** and **ANNA ERIKA**'s right to full payment of the **Purchase Price** due under the **Purchase Agreement**.

65.    Upon information and belief, **SIRANGELO ENTERPRISES** is a mere business name and alter ego of **SIRANGELO**.

66.    Upon information and belief, application for approval of **STERN** as the principal of **BAYWOOD** to act as Operator of the **Facility** was made to the State of New York Department of Health on July 17, 2006.

67.    From and after on or about July 17, 2006, **BAYWOOD** has acted as the Operator of the **Facility**.

**VII**

**COMPLETION OF SALE AND DEMAND FOR PAYMENT**

68.    The combined effect of the **Purchase Agreement**, the **Management Agreement**, the **Management Services Agreement**, the **Consent to Assignment of Lease**, the **Amended Purchase Agreement** and the **Side Agreement** all as hereinbefore described, was a sale, by transfer of possession of and exclusive control over all of the assets intended to be conveyed pursuant to the **Purchase Agreement**, to **BAYWOOD**, in exchange for payment of valuable consideration, including the release of the **Escrow**, a lump sum payment of $400,000.00; and, the monthly payments being to **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, as hereinbefore described.

69.    As a result of the foregoing, the **Broker's Fee** due **PRESTIGE** was fully earned and became due and payable.

70.    **PRESTIGE** has heretofore duly demanded in writing that **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL**, and the respective principals of both, that they, and each of them, account to **PRESTIGE** for all monies and other consideration received by them as and for consideration for the sale of the assets intended to be conveyed pursuant to the **Purchase Agreement**, which demand has not been responded to through and including the date of this Complaint.

71.    **PRESTIGE** has heretofore duly demanded payment of the **Broker's Fee** due it in writing, no part of which has been paid through and including the date of this Complaint.

## FOR A FIRST CLAIM FOR RELIEF
### Breach of Contract
**(ANNA ERIKA, HENDERSON HILL, CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J and SIRANGELO)**

The Plaintiff repeats, reiterates and realleges each and every allegation heretofore made herein, with the same force and effect as if each such allegation were repeated at length herein.

72.    At all times hereinbefore and hereinafter mentioned, the **Exclusive Listing Agreement** was a valid and subsisting contract between **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** as Seller, and **PRESTIGE**, as Broker, the terms of which were mutually agreed to by each of the parties thereto, each of which were authorized to and had full legal capacity to enter into same; and, each of which parties received full and valuable consideration for their respective entry into same.

73.    **PRESTIGE** fully performed all of the duties on its part to be performed pursuant to the **Exclusive Listing Agreement** by providing a buyer ready, willing and able to purchase the private proprietary adult home and ancillary services business and assets of **HENDERSON HILL**

operated at the **Premises**; and, which did in fact purchase those assets, in the manner hereinbefore described.

74. As a result of the foregoing, a **Broker's Fee** of not less than $270,000.00 was due and owing to **PRESTIGE** by **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL**, and the respective principals of both, no part of which has been paid, despite due demand having been made therefor, which failure to remit was a material breach of the **Exclusive Listing Agreement** by **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both.

75. As a result of the foregoing, **PRESTIGE** is due additional sums in the amount of 3% of any and all consideration paid or to be paid to **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, in excess of $9,000,000.00 as a result of the **Amended Purchase Agreement**, and the **Side Agreement**, no part of which has been paid, despite due demand having been made therefor.

76. **PRESTIGE**'s damages were directly and proximately caused by the breach of the **Exclusive Listing Agreement** by **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, in the manner hereinbefore described.

## FOR A SECOND CLAIM FOR RELIEF
### Breach of Fiduciary Duty
**(ANNA ERIKA, HENDERSON HILL, CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J and SIRANGELO)**

The Plaintiff repeats, reiterates and realleges each and every allegation heretofore made herein, with the same force and effect as if each such allegation were repeated at length herein.

77. The **Exclusive Listing Agreement** created an agency relationship between **ANNA ERIKA**, as Principal, and **PRESTIGE**, as Agent, pursuant to which, **ANNA ERIKA**, its successors

and assigns, including **HENDERSON HILL**, and the respective principals thereof, owed **PRESTIGE** fiduciary duties of loyalty, care and good faith performance of the duties they and each of them undertook on their part to be performed pursuant to the **Exclusive Listing Agreement**, including, but not limited to, by reason of specification, compensating **PRESTIGE** for producing a buyer, ready willing and able to perform the **Purchase Agreement**; and, fully and adequately informing **PRESTIGE** of the transactions made which operated to complete that transaction.

78.     **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, breached the fiduciary duties owed **PRESTIGE** by arranging and orchestrating the transfer of the possession, management and control of the assets of **HENDERSON HILL** operated at the **Premises**; and the **Facility**, in a manner calculated to and which in fact did effectuate a sale of those assets, without having to schedule a formal **Closing**, in the manner hereinbefore described.

79.     The general partners and owners of **ANNA ERIKA** and/or **HENDERSON HILL**, to wit, **CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J** and **SIRANGELO**, and each of them, had actual knowledge of all of the agreements made by and on behalf of **ANNA ERIKA** and/or **HENDERSON HILL** hereinbefore described, and resisted and/or outright refused to furnish **PRESTIGE** with the particulars of same so as to secret and hide the consummation of the **Purchase Agreement** in the manner hereinbefore described, which conduct was in breach of the fiduciary duties owed by them, and each of them, to **PRESTIGE**.

80.     The refusal of **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, to account to **PRESTIGE** for all monies and other consideration received by them as and for consideration for the sale of the assets intended to be

conveyed pursuant to the **Purchase Agreement**, and to pay **PRESTIGE** the **Broker's Fee** it earned in the manner hereinbefore described and after due demand therefor, were in breach of the fiduciary duties owed by them, and each of them, to **PRESTIGE**.

81.     At all times hereinbefore and hereinafter mentioned, **PRESTIGE** conducted itself with extreme loyalty to its principal, **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both.

82.     As a result of the breach of fiduciary duties owed **PRESTIGE** in the manner aforesaid, **PRESTIGE** has been damaged in the sum of not less than $270,000.00.

83.     As a result of the foregoing, **PRESTIGE** has been damaged in the amount of 3% of any and all consideration paid or to be paid to **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, in excess of $9,000,000.00 as a result of the **Amended Purchase Agreement**, and the **Side Agreement**.

84.     **PRESTIGE**'s damages were directly and proximately caused by the breach of fiduciary duties owed **PRESTIGE** by **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, in the manner hereinbefore described.

## FOR A THIRD CLAIM FOR RELIEF
### Conversion
**(ANNA ERIKA, HENDERSON HILL, CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J and SIRANGELO)**

The Plaintiff repeats, reiterates and realleges each and every allegation heretofore made herein, with the same force and effect as if each such allegation were repeated at length herein.

85.     The sums heretofore described that are being paid to **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, and to

**SIRANGELO ENTERPRISES**, were secreted from **PRESTIGE** and include sums due and owing as the **Broker's Fee** earned by **PRESTIGE** pursuant to the **Exclusive Listing Agreement**.

86.    **ANNA ERIKA** and/or **HENDERSON HILL** and **SIRANGELO ENTERPRISES** and the general partners and owners of **ANNA ERIKA** and/or **HENDERSON HILL**, to wit, **CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J** and **SIRANGELO**, and each of them, have unlawfully converted and retained the sums due and owing **PRESTIGE** as and for its **Broker's Fee**.

87.    As a result of the foregoing, **PRESTIGE** has been damaged in the sum of not less than $270,000.00.

88.    As a result of the foregoing, **PRESTIGE** has been damaged in the amount of 3% of any and all consideration paid or to be paid to **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, in excess of $9,000,000.00 as a result of the **Amended Purchase Agreement**, and the **Side Agreement.**

<u>**FOR A FOURTH CLAIM FOR RELIEF**</u>
**Actual Fraud**
**(ANNA ERIKA, HENDERSON HILL, CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J and SIRANGELO)**

The Plaintiff repeats, reiterates and realleges each and every allegation heretofore made herein, with the same force and effect as if each such allegation were repeated at length herein.

89.    **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, represented to **PRESTIGE** that they would fully and fairly compensate **PRESTIGE** if it produced a buyer ready, willing and able to purchase the private proprietary adult home and ancillary services business and assets of **HENDERSON HILL** operated at the **Premises**.

Page 25 of 38

90.     The foregoing representation was made by **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, for the express purpose of inducing **PRESTIGE** to enter into the **Exclusive Listing Agreement** and to thereafter perform its duties thereunder in the manner hereinbefore described.

91.     The truth of the foregoing representation by **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, was a material inducement to **PRESTIGE** to enter into the **Exclusive Listing Agreement** and to thereafter perform its duties thereunder in the manner hereinbefore described.

92.     **PRESTIGE** relied upon the truth of the foregoing representation by **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, in entering into the **Exclusive Listing Agreement** and thereafter performing its duties thereunder in the manner hereinbefore described.

93.     The foregoing representation by **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, was false when made, in they, and each of them, had no intention to fully and fairly compensate **PRESTIGE** for producing a buyer ready, willing and able to purchase the private proprietary adult home and ancillary services business and assets of **HENDERSON HILL** operated at the **Premises**.

94.     The falsity of the foregoing representation by **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, is demonstrated by their thereafter arranging and orchestrating the management and control of the assets of **HENDERSON HILL** operated at the **Premises**; and the **Facility,** in a manner calculated to effectuate a sale of those assets, and receiving substantial payments for same, without having to

schedule a formal **Closing**; so as to unlawfully delay and deprive **PRESTIGE** of the **Broker's Fee** it earned pursuant to the **Exclusive Listing Agreement**, in the manner hereinbefore described.

95.     The general partners and owners of **ANNA ERIKA** and/or **HENDERSON HILL**, to wit, **CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J** and **SIRANGELO**, and each of them, had actual knowledge of all of the payments, arrangements, orchestrations and agreements made by and on behalf of **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL**, all as hereinbefore described, and intended thereby to deprive **PRESTIGE** of the **Broker's Fee** it earned pursuant to the **Exclusive Listing Agreement**, all in the manner hereinbefore described.

96.     **PRESTIGE** was ignorant of the falsity of the foregoing representation by **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, at the time said representation was made, at the times **PRESTIGE** thereafter relied upon the truth of the foregoing representation to render the services hereinbefore described; and, at the time **PRESTIGE** produced a buyer ready, willing and able to purchase the private proprietary adult home and ancillary services business and assets of **HENDERSON HILL** operated at the **Premises**, as set forth in the **Purchase Agreement** as thereafter amended and modified in the manner and to the extent hereinbefore described.

97.     But for the falsity of the foregoing representation and the conduct of **ANNA ERIKA** and/or **HENDERSON HILL**, through its general partners and owners, to wit, **CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J** and **SIRANGELO**, and each of them, as hereinbefore described, **PRESTIGE** would have been paid the **Broker's Fee** it earned pursuant to the **Exclusive Listing Agreement**, in the manner hereinbefore described.

98.     As a result of the foregoing, **PRESTIGE** has been damaged in the sum of not less than $270,000.00.

99.     As a result of the foregoing, **PRESTIGE** has been damaged in the amount of 3% of any and all consideration paid or to be paid to **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, in excess of $9,000,000.00 as a result of the **Amended Purchase Agreement**, and the **Side Agreement.**

**FOR A FIFTH CLAIM FOR RELIEF**
**Constructive Fraud**

**(ANNA ERIKA, HENDERSON HILL, CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J and SIRANGELO)**

The Plaintiff repeats, reiterates and realleges each and every allegation heretofore made herein, with the same force and effect as if each such allegation were repeated at length herein.

100.    The hereinbefore described representation by **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, was made while a fiduciary relationship existed between **ANNA ERIKA** and **PRESTIGE**.

101.    The general partners and owners of **ANNA ERIKA** and/or **HENDERSON HILL**, to wit, **CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J** and **SIRANGELO,** and each of them, had actual knowledge of the fiduciary relationship existed between **ANNA ERIKA** and **PRESTIGE** and of all of the payments, arrangements, orchestrations and agreements made by and on behalf of **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL,** all as hereinbefore described.

102.    But for the falsity of the hereinbefore described representation and the conduct of **ANNA ERIKA** and/or **HENDERSON HILL**, through its general partners and owners, to wit,

Page 28 of 38

CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J and SIRANGELO, and each of them, as hereinbefore described, **PRESTIGE** would have been paid the **Broker's Fee** it earned pursuant to the **Exclusive Listing Agreement**, in the manner hereinbefore described.

103.    As a result of the foregoing, **PRESTIGE** has been damaged in the sum of not less than $270,000.00.

104.    As a result of the foregoing, **PRESTIGE** has been damaged in the amount of 3% of any and all consideration paid or to be paid to **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, in excess of $9,000,000.00 as a result of the **Amended Purchase Agreement**, and the **Side Agreement.**

### FOR A SIXTH CLAIM FOR RELIEF
**Constructive Trust**
**(ANNA ERIKA, HENDERSON HILL, CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J and SIRANGELO)**

The Plaintiff repeats, reiterates and realleges each and every allegation heretofore made herein, with the same force and effect as if each such allegation were repeated at length herein.

105.    The hereinbefore described payments made to **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, as consideration for the sale of the private proprietary adult home and ancillary services business and assets of **HENDERSON HILL** operated at the **Premises**, as set forth in the **Purchase Agreement**, were and continue to be received while a fiduciary relationship exists between **ANNA ERIKA** and **PRESTIGE**, pursuant to the **Exclusive Listing Agreement**.

106.    **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, have and continue to receive valuable consideration for the sale of the

private proprietary adult home and ancillary services business and assets of **HENDERSON HILL**

operated at the **Premises**, as set forth in the **Purchase Agreement**, while in breach of the fiduciary

duties owed **PRESTIGE,** pursuant to the **Exclusive Listing Agreement**, in the manner hereinbefore

described.

107.    The payments made to **ANNA ERIKA**, its successors and assigns, including

**HENDERSON HILL** and the respective principals of both, for the sale of the private proprietary

adult home and ancillary services business and assets of **HENDERSON HILL** operated at the

**Premises**, as set forth in the **Purchase Agreement**, have been and continue to be made in reliance

with the promises made in the **Purchase Agreement** and in the **Exclusive Listing Agreement**.

108.    **PRESTIGE** has an interest in and claim to a portion of the sums heretofore described

that are being paid to **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL**

and the respective principals of both, and to **SIRANGELO ENTERPRISES**, as a result of and

pursuant to the **Purchase Agreement**, the **Amended Purchase Agreement**, and the **Side**

**Agreement**, in the amount of the **Broker's Fee** provided to be paid pursuant to the **Exclusive**

**Listing Agreement**.

109.    **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the

respective principals of both, have been and continue to be unjustly enriched by the retention of the

payments and other consideration made and to be made for the sale of the private proprietary adult

home and ancillary services business and assets of **HENDERSON HILL** operated at the **Premises**,

as set forth in the **Purchase Agreement,** in the manner heretofore described, which payments

include the **Broker's Fee** earned by **PRESTIGE** pursuant to the **Exclusive Listing Agreement**,

which fee is not less than $270,000.00.

Page 30 of 38

110.   Unless the sums heretofore described that are being paid to **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, and to **SIRANGELO ENTERPRISES** are subjected to a constructive trust imposed on **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL**, and **SIRANGELO ENTERPRISES** and the general partners and owners of **ANNA ERIKA** and/or **HENDERSON HILL**, to wit, **CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J** and **SIRANGELO**, and each of them, the **Broker's Fee** due **PRESTIGE** may be squandered and lost.

111.   **PRESTIGE** has no adequate remedy at law.

### FOR A SEVENTH CLAIM FOR RELIEF
#### Unjust Enrichment
#### (MANOR, BAYWOOD, BEER, SCHARF and STERN)

The Plaintiff repeats, reiterates and realleges each and every allegation heretofore made herein, with the same force and effect as if each such allegation were repeated at length herein.

112.   As a result of the efforts of **PRESTIGE** in the manner hereinbefore described, **MANOR**, its successors and assigns, including **BAYWOOD** and the respective principals of both, to, wit, **BEER, SCHARF** and **STERN**, have acquired possession, management and control of the private proprietary adult home and ancillary services business and assets of **HENDERSON HILL** operated at the **Premises**, as set forth in the **Purchase Agreement**.

113.   The retention of possession, management and control of the private proprietary adult home and ancillary services business and assets of **HENDERSON HILL** operated at the **Premises**, as set forth in the **Purchase Agreement**, by **MANOR**, its successors and assigns, including **BAYWOOD** and the respective principals of both, to, wit, **BEER, SCHARF** and **STERN**, in the manner heretofore described was at the expense and to the detriment of **PRESTIGE**.

Page 31 of 38

114.   It is inequitable that **MANOR**, its successors and assigns, including **BAYWOOD** and the respective principals of both, to, wit, **BEER, SCHARF** and **STERN**, be permitted to retain possession, management and control of the private proprietary adult home and ancillary services business and assets of **HENDERSON HILL** operated at the **Premises**, as set forth in the **Purchase Agreement**, in the manner heretofore described, at the expense of **PRESTIGE**.

115.   As a result of the foregoing, **MANOR**, its successors and assigns, including **BAYWOOD** and the respective principals of both, to, wit, **BEER, SCHARF** and **STERN**, have been unjustly enriched by the acquisition of possession, management and control of the private proprietary adult home and ancillary services business and assets of **HENDERSON HILL** operated at the **Premises**, as set forth in the **Purchase Agreement,** in the manner heretofore described, without payment of the **Broker's Fee** earned by **PRESTIGE** pursuant to the **Exclusive Listing Agreement** in the sum of not less than $270,000.00.

116.   As a result of the foregoing, **MANOR**, its successors and assigns, including **BAYWOOD** and the respective principals of both, to, wit, **BEER, SCHARF** and **STERN**, have been unjustly enriched by the sum of 3% of any and all consideration paid or to be paid to **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, in excess of $9,000,000.00, which is due and owing **PRESTIGE** as a result of the **Amended Purchase Agreement**, and the **Side Agreement**.

### FOR A EIGHTH CLAIM FOR RELIEF
**Tortious Interference With Contract**
**(MANOR, BAYWOOD, BEER, SCHARF and STERN)**

The Plaintiff repeats, reiterates and realleges each and every allegation heretofore made herein, with the same force and effect as if each such allegation were repeated at length herein.

Page 32 of 38

117.   **MANOR**, its successors and assigns, including **BAYWOOD** and the respective principals of both, to, wit, **BEER, SCHARF** and **STERN**, had actual knowledge of all of the agreements made by and on behalf of **ANNA ERIKA** and/or **HENDERSON HILL** hereinbefore described, in general, and of the **Purchase Agreement** and the **Exclusive Listing Agreement** in particular.

118.   **MANOR**, its successors and assigns, including **BAYWOOD** and the respective principals of both, to, wit, **BEER, SCHARF** and **STERN**, had actual knowledge that the **Purchase Agreement** and the **Exclusive Listing Agreement** were, at all times hereinbefore and hereinafter mentioned, valid and subsisting contracts between the respective parties thereto.

119.   At all times hereinbefore and hereinafter mentioned, **MANOR**, its successors and assigns, including **BAYWOOD** and the respective principals of both, to, wit, **BEER, SCHARF** and **STERN**, had actual knowledge that the **Exclusive Listing Agreement** between **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL**, and the respective principals thereof, and **PRESTIGE**, established a fiduciary relationship between the respective parties thereto.

120.   **MANOR**, its successors and assigns, including **BAYWOOD** and the respective principals of both, to, wit, **BEER, SCHARF** and **STERN**, had actual knowledge that a sale of the private proprietary adult home and ancillary services business and assets of **HENDERSON HILL** operated at the **Premises**, as set forth in the **Purchase Agreement**, would require **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, to pay the **Broker's Fee** earned by **PRESTIGE** pursuant to the **Exclusive Listing Agreement,** in the manner hereinbefore described.

121.   **MANOR**, its successors and assigns, including **BAYWOOD** and the respective principals of both, to, wit, **BEER, SCHARF** and **STERN**, had actual knowledge that payment of the **Escrow** held pursuant to the **Purchase Agreement**, together with the bulk and monthly remittances described in the **Management Agreement**, the **Amended Purchase Agreement** and in the **Side Agreement**, to ANNA ERIKA, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, and to **SIRANGELO ENTERPRISES**, when coupled with the **Management Services Agreement**, gave **MANOR**, its successors and assigns, including **BAYWOOD** and the respective principals of both, to, wit, **BEER, SCHARF** and **STERN**, possession of and total effective operating control over the private proprietary adult home and ancillary services business and assets of **HENDERSON HILL** operated at the **Premises**, that were to be sold pursuant to the **Purchase Agreement**.

122.   **MANOR**, its successors and assigns, including **BAYWOOD** and the respective principals of both, to, wit, **BEER, SCHARF** and **STERN**, had actual knowledge that their assent to make the payments of the **Escrow** held pursuant to the **Purchase Agreement**, together with the bulk and monthly remittances described in the **Management Agreement**, the **Amended Purchase Agreement** and in the **Side Agreement**, to ANNA ERIKA, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, and to **SIRANGELO ENTERPRISES**, without having a formal closing pursuant to the **Purchase Agreement**, would enable **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, to represent to **PRESTIGE** that the sale of the private proprietary adult home and ancillary services business and assets of **HENDERSON HILL** operated at the **Premises**, as set forth in the **Purchase Agreement**, was not complete, even though **MANOR**, its successors and assigns,

including **BAYWOOD** and the respective principals of both, to, wit, **BEER, SCHARF** and **STERN**, had actual possession of and total effective operating control over those assets and would therefore operate to deprive **PRESTIGE** of the Broker's Fee it earned by pursuant to the **Exclusive Listing Agreement,** in the manner hereinbefore described.

123.   **MANOR,** its successors and assigns, including **BAYWOOD** and the respective principals of both, to, wit, **BEER, SCHARF** and **STERN,** and each of them, refused and ignored **PRESTIGE**'s demands to furnish **PRESTIGE** with the details and particulars of the payments, arrangements, orchestrations and agreements made by and on behalf of **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, all as hereinbefore described.

124.   **MANOR,** its successors and assigns, including **BAYWOOD** and the respective principals of both, to, wit, **BEER, SCHARF** and **STERN,** and each of them, retained possession, management and control of the private proprietary adult home and ancillary services business and assets of **HENDERSON HILL** operated at the **Premises,** as set forth in the **Purchase Agreement,** and the benefits of same, all as hereinbefore described.

125.   The conduct of **MANOR,** its successors and assigns, including **BAYWOOD** and the respective principals of both, to, wit, **BEER, SCHARF** and **STERN,** as hereinbefore described, was intended to, and did in fact, induce **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, to breach the **Exclusive Listing Agreement,** by refusing to pay **PRESTIGE** the Broker's Fee it earned pursuant to same.

126.   The knowing and intentional participation of **MANOR,** its successors and assigns, including **BAYWOOD** and the respective principals of both, to, wit, **BEER, SCHARF** and

STERN, in the arrangements, orchestrations and agreements made by and on behalf of **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, hereinbefore described, was unlawful and without justification.

127.    As a result of the foregoing **ANNA ERIKA** and/or **HENDERSON HILL**, through its general partners and owners, to wit, **CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J** and **SIRANGELO**, and each of them, did breach the **Exclusive Listing Agreement** with **PRESTIGE** in the manner aforesaid.

128.    The conduct of **MANOR**, its successors and assigns, including **BAYWOOD** and the respective principals of both, to, wit, **BEER, SCHARF** and **STERN**, as hereinbefore described, was an actual and proximate cause of the breach of the **Exclusive Listing Agreement** with **PRESTIGE** by **ANNA ERIKA** and/or **HENDERSON HILL**, through its general partners and owners, to wit, **CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J** and **SIRANGELO**, and each of them, in the manner aforesaid

129.    As a result of the foregoing, **PRESTIGE** has been damaged in the sum of not less than $270,000.00.

130.    As a result of the foregoing, **PRESTIGE** has been damaged in the amount of 3% of any and all consideration paid or to be paid to **ANNA ERIKA**, its successors and assigns, including **HENDERSON HILL** and the respective principals of both, in excess of $9,000,000.00 as a result of the **Amended Purchase Agreement**, and the **Side Agreement**.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff prays for the following relief:

Page 36 of 38

     a.      Judgment against **ANNA ERIKA, HENDERSON HILL, CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J** and **SIRANGELO**, and each of them, on the Second Claim for Relief, directing they and each of them render a full accounting for all monies and other consideration they, or any of them, received, directly or indirectly, for the assets of **HENDERSON HILL**, from February 13, 2003 to the date of the accounting;

     b.      Judgment against **ANNA ERIKA, HENDERSON HILL, CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J** and **SIRANGELO**, and each of them, on the First, Second, Third, Fourth, and Fifth Claims for Relief, for the actual and consequential damages sustained by the Plaintiff, in the sum of $270,000.00, or such actual amounts as shall be proven at trial or summary disposition of this action, or upon accounting, with interest thereon from February 13, 2003 to the date of the judgment;

     c.      Judgment against **ANNA ERIKA, HENDERSON HILL, CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J** and **SIRANGELO**, and each of them, on the Second, Fourth, and Fifth Claims for Relief, in a sum equal to treble of the actual and consequential damages sustained by the Plaintiff, as and for exemplary or punitive damages to the extent same are permitted by statute and/or applicable local law, with interest thereon from February 13, 2003 to the date of the judgment;

     d.      Judgment against **MANOR, BAYWOOD, BEER, SCHARF** and **STERN**, and each of them, on the Seventh and Eighth Claims for Relief, for the actual and consequential damages sustained by the Plaintiff, in the sum of $270,000.00, or such actual amounts as shall be proven at trial.

e.    Judgment against **MANOR, BAYWOOD, BEER, SCHARF** and **STERN**, and each of them, on the Eighth Claim for Relief, in a sum equal to treble of the actual and consequential damages sustained by the Plaintiff, as and for exemplary or punitive damages to the extent same are permitted by statute and/or applicable local law, with interest thereon from February 13, 2003 to the date of the judgment;

f.    Judgment against **ANNA ERIKA, HENDERSON HILL, CILLO, DECHOWITZ, EMMA, SERVIDEO, SIRANGELO-J** and **SIRANGELO**, and each of them, on the Sixth Claim for Relief, imposing a constructive trust over all monies paid to or on their behalf as part of the sale of assets of **HENDERSON HILL**;

g.    Judgment awarding the Plaintiff, its attorney's fees and costs reasonably incurred in bringing this action, as provided by law or contract;

h.    That the Plaintiff have such other, further and different relief as to the Court may seem just, proper and equitable in the premises, including, but not limited to, by reason of specification, such *pendente lite* and ancillary relief as may be deemed just and proper in such case made and presented.

**THE LAW FIRM OF RICHARD S. BONFIGLIO, ESQ.**

**Richard S. Bonfiglio [RSB 7778]**
_suedoctor@aol.com_
238 - 92nd Street
Brooklyn, NY  11209-5702
718-833-5573
**Attorney for Plaintiffs**

Brooklyn, New York
March 31, 2009

Page 38 of 38

**EXHIBIT A**

# LISTING CONTRACT
## EXCLUSIVE RIGHT TO SELL BUSINESS

**BROKER:** The Prestige Group, Inc.
**SELLER:** Anna Erika Home For Adults Associates, a Partnership with Offices at 110 Henderson Avenue, Staten Island, New York

**BUSINESS:**                                                    LISTED PRICE _17,500,000—_
Henderson Hill Adult Home And Assisted Living, Inc.
Address: 110 Henderson Avenue, Staten Island, New York
Present Use: Private Proprietary Adult Home Maximum Capacity 427
Residents Known as Anna Erika Assisted Living, Adult Home: 305 beds,
Assisted Living: 122 beds.

Starting Date of this Contract:___October 15, 2001_____

Ending Date of this Contract:____April 15, 2002 _____

Purpose of this Contract: Seller is hiring Broker to market Business and to find a Buyer.  Seller will refer all offers and inquiries to Broker.  Seller allows Broker to use print/or electronic advertising.  Broker is acting as Seller's Agent.

Broker's Fee: Broker and Seller have agreed the fee that Seller will pay Broker is 3% of/from the sale price and paid by Seller.

Payment of Broker's Fee:
Seller must pay Broker's Fee if Business, or any ownership interest in it, is sold or exchanged during the length or term of this Contract by Broker, Broker's agents, Seller, or any other person or broker, at the listed price or any other price acceptable to Seller.

Seller will pay Broker's Fee if negotiations that are pending at the Ending Date of this Contract result in a sale.
Seller will pay Broker's Fee after the Ending Date of this Contract IF:
1) A sale occurs within 356 days of the Ending date, AND
2) The Buyer was shown or negotiated to buy the Business during the term oft his Contract.

3) If a Buyer signs an agreement of sale then refuses to buy the Business, or if a Buyer is unable to buy it because of failing to do all the things required by the agreement of sale, Seller will pay Broker:
A/ 50% of/from buyer's deposit monies, OR
B/ the Broker's Fee, whichever is less.

Conflict of Interest: A conflict of interest is when Broker has a financial or personal interest where Broker cannot put Seller's interest before any other. If Broker or any Broker's salespeople, has a conflict of interest, Broker will notify Seller in a timely manner.

Deposit Money: Broker or any person Seller and the Buyer name in the agreement of sale, will keep all deposit monies paid by or for the Buyer in an interest bearing escrow account with interest accruing to the party named in the agreement of sale.

Entire Contract: This Contract is the entire agreement between Broker and Seller. Any verbal or written agreements that were made before are not part of this Contract.

Changes to this Contract: All changes to this Contract must be in writing and sighed by Broker and Seller

Notice Before Signing: If Seller has legal questions, seller is advised to consult an attorney.

SELLER _____ DATE _10/10/01_

SELLER _____ DATE _____

SELLER _____ DATE _____

SELLER _____ DATE _____

BROKER (Company Name)_____ The Prestige Group, Inc._____
Accepted By _____ Date _10/10/01_
Mailing Address: 321 S. Valley Forge Road, Devon, PA  19333
Phone: 610-902-3900   Fax: 610-902-3999
E-Mail: ronkrieger1@yahoo.com

**EXHIBIT B**

## CHANGE TO LISTING CONTRACT

CLC

PROPERTY/BUSINESS AREA ERIKA HOME FOR ADULTS/HENDERSON HILL ADULT HOME ALP, INC.

BROKER (Company)  The Prestige Group, inc.
SELLER

_____ Vincent Sirangelo

DATE OF LISTING CONTRACT  October 15, 2001

LISTED PRICE $ 17,500,000.

Broker and Seller agree to change the terms of the above Listing Contract as follows:

1.  Ending Date of the Listing Contract is changed to: ___ OCTOBER 15, 2002 _____
2.  Listed Price is changed to: $ _____
3.  Appoint Designated Agent(s): _____
    Seller renounces the agency relationships held with all licensees affiliated with Broker who are not Designated Agents for Seller
4.  Remove Designated Agent(s): _____

All other terms and conditions of the Listing Contract remain unchanged and in full force and effect.

SELLER _____                      DATE  4/18/02

BROKER (Company Name)   The Prestige Group, inc.

ACCEPTED BY _____                     DATE  4/15/2001

**EXHIBIT C**

# CHANGE TO LISTING CONTRACT

Business:   Anna Erika Home for Adults                                          CLC
            Henderson Hill Adult Home ALP, Inc.

**BROKER (Company)** The Prestige Group, Inc.
**SELLER**

   Vincent Sirangelo

**DATE OF LISTING CONTRACT** October 15, 2001

                                                                **LISTED PRICE $** 17,500.00

Broker and Seller agree to change the terms of the above Listing Contract as follows:

1.   Ending Date of the Listing Contract is changed to: October 15, 2003
2.   Listed Price is changed to:  $ 14,500.00
3.   Appoint Designated Agent(s): _____

     Seller renounces the agency relationships held with all licensees affiliated with Broker who are not Designated Agents for Seller.
4.   Remove Designated Agent(s): _____

All other terms and conditions of the Listing Contract remain unchanged and in full force and effect.
Seller may cancel this contract, after six months, upon 30 days written notice to Broker.

SELLER _____                    DATE  9/23/02
Vincent Sirangelo

**BROKER (Company Name)** The Prestige Group, Inc.

**ACCEPTED BY** _____              DATE  9/23/02

          Ronald A. Krieger

PREPARED BY AGENT: Prestige Group, Inc., Real Estate Company
. Change to Listing Contract, 8/02. Pennsylvania Association of REALTORS®
COPYRIGHT PENNSYLVANIA ASSOCIATION OF REALTORS® 1996
FAST® Software, ©2002, Version 8.10. Licensed to PRESTIGE GROUP, INC., PRESTIGE GROUP, INC.
                          09/06/02 16:42:51

                                                                Page 1 of 1

**EXHIBIT D**

PURCHASE AGREEMENT

AGREEMENT made the _13_ day of February, 2003, by and between Henderson Hill Adult Home ALP, Inc. f/k/a Anna Erika Home for Adults, a New York corporation with its principal place of business at 110 Henderson Avenue, Staten Island, New York 10301, (hereinafter referred to as the "Seller") with its principal place of business at 110 Henderson Avenue, Staten Island, New York 10301 (hereinafter referred to as the "Premises"), and Island Manor, Inc., which Purchaser will incorporate as either a for profit or a not for profit New York corporation prior to the closing date, its successors and/or assigns, with its principal place of business at c/o Mendel Zilberberg & Associates, P.C., 6619 Thirteenth Avenue, Brooklyn, New York 11219 (hereinafter referred to as the "Purchaser").

W I T N E S S E T H

WHEREAS, Seller is the tenant and operator of an adult care facility (hereinafter referred to as the "Business" or "Facility") located at 110 Henderson Avenue, Staten Island, New York 10301; and

WHEREAS, Seller desires to sell various assets of the Business and assign various Leases and a Service Agreement as more specifically described herein, and Purchaser desires to purchase all of said assets and assume said Leases and the Service Agreement in accordance with the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the promises and mutual covenants contained herein and other valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.          SALE OF ASSETS OF THE BUSINESS.

(a)      Seller shall sell and transfer to Purchaser, and Purchaser shall purchase and accept from Seller upon the terms and conditions set forth in this Agreement, all of Seller's right, title and interest in and to all of the following assets (hereinafter collectively the "Purchased Assets"):

i.      All intangible personal property related to the Premises, owned by Seller and used in connection with the Premises and Facility;

ii.      The machinery, equipment, computer equipment, telephone equipment, furniture, medical equipment, automobiles, motor vehicles, supplies,

1

bedding, fixtures and leasehold improvements as same may presently exist in the Premises or may be owned by the Facility or Business to the extent that same is not owned by Hilmoor Associates (hereinafter referred to as the "Landlord"), a partnership;

iii.  The trade name Henderson Hill Adult Home ALP, Inc. and/or Anna Erika Home for Adults and its variations (Seller has no registered trademark for the aforesaid);

iv.  Seller's goodwill and reputation in the community ("Goodwill");

v.  Resident list;

vi.  Resident Records;

vii.  Resident's funds held in trust;

viii.  Resident's personal allowance accounts;

ix.  The telephone and fax numbers to the extent they are transferable;

x.  Insurance policies relating to the premises and business to the extent said policies are transferable or assignable;

xi.  Permits, licenses, and/or letters of approval, specifically the New York State Department of Health Operating Certificate in favor of Henderson Hill Adult Home and Assisted Living, Inc. to operate a private proprietary adult home with a 427 resident maximum capacity; the New York State Department of Social Services Authorization in favor of Anna Erika Home for Adults to operate a six person adult day care program, issued October 27, 1997; the New York State Department of Health License in favor of Henderson Hill Adult Home and ALP, Inc. to operate a licensed home care service agency (LHCSA) to provide the following services (to the extent authorized by said license): Nursing, Home Health Aide, Personal Care, Physical Therapy,

2

Occupational Therapy, Respiratory Therapy, Speech-Language Pathology, Medical Social Work, Nutrition and Medical Supply Equip. and Appl., effective on February 14, 2000; and the New York State Department of Health License in favor of Henderson Hill Adult Home and ALP, Inc. to operate the services of Personal Care, Application of Sterile Dressings by RN and Administration of Medications by RN, effective on February 14, 2000, which are all set forth in Exhibit 1, annexed hereto and made a part hereof (hereinafter referred collectively as "Licenses");

xii.    Contract rights to the extent that they are transferable;

xiii.    General intangibles relating to the Premises and Facility;

xiv.    Inventory;

xv.    Assignment of the Leases as set forth more specifically herein; and

xvi.    Assignment of the Service Agreement as set forth more specifically herein;

(b)    The sale shall not include Seller's accounts payable or accounts receivable or cash held by the business, prior to the date of the Closing.

2.    PURCHASE PRICE.

2.1    The total purchase price for the Purchased Assets is nine million Dollars ($9,000,000.00).

2.2    The Purchase Price shall be allocated as follows:

(a) ASSETS

Leaseholds, Service Agreement, machinery, equipment, computer equipment, furniture, medical equipment, supplies, bedding, fixtures and leasehold improvements relating to the Premises, the trade name Henderson Hill Adult Home ALP, Inc. and/or Anna Erika Home for Adults and its variations, Goodwill, the resident list, the telephone and fax numbers, to the extent they are transferable, insurance policies, permits, licenses, and letters of approval as set forth in Exhibit 1 annexed hereto, contract rights, general intangibles relating to the Premises and Facility.

3

The agreed upon value of these assets is eight million nine hundred and eighty five thousand Dollars ($8,985,000.00).

The resident's funds held in trust and residents personal allowance accounts shall be transferred at closing.

(b) INVENTORY

To the extent that there is inventory on the date of closing, it will be included in the sale. Inventory will be maintained pursuant to the requirements of state law. The agreed upon value of this inventory is fifteen thousand Dollars ($15,000.00).

3. PAYMENT OF PURCHASE PRICE AND CERTAIN SECURITY.

3.1.    The Purchase Price shall be paid by Purchaser as follows:

(a) Two hundred and fifty thousand Dollars ($250,000.00) by check subject to collection upon execution of this Agreement (the "Contract Deposit") to be held in an interest-bearing escrow account, at a FDIC insured bank, by Seller's attorney (hereinafter referred to as "Escrowee") upon the execution of, and subject to the provisions of this Purchase Agreement until Closing (as hereinafter defined) or sooner pursuant to the terms of this Agreement. At closing of the sale, the deposit, plus interest, shall be credited towards the Purchase Price. The cost of the formation of the escrow account is two hundred and fifty dollars ($250) whose payment will be borne by the party who ultimately receives the escrow.

Purchaser agrees that in the event Purchaser fails to close pursuant to the terms of this Agreement, excepting through some fault of Seller, or pursuant to the provisions set forth herein, then in that event, the Contract Deposit shall be retained by Seller as and for liquidated damages for all expenses, delay, and legal fees.

(b) One million fifty thousand Dollars ($1,050,000.00) to be paid at Closing.

(c) Monthly payment of seventy one thousand two hundred ninety- six dollars and thirty cents ($71,296.30) to be paid for (108) one hundred and eight months. Said payments are represented by a promissory note herein attached to this Agreement.

(1)    Said monthly payments shall be due by the 15th of the month.

4

(2)      If said monthly payments are not received by the 15th of the month, there will be a 10 day grace period ("grace period") granted to the Purchaser.

(3)      In the event that said payment is not received until after the grace period there will be a 2% late payment fee. $\overset{\text{but not to exceed \$3100 in total}}{}$ In addition, Seller may at that point send a notice of default providing a 30 day cure period ("cure period").

(4)      In the event that said payment is not received within the cure period, Seller may thereafter declare a default and breach of contract.

(5)      At any time thereafter, Purchaser can cure said default and breach of contract by paying the delinquent payment including any accrued late payment fees with an additional 6% per annum pro-rated on a daily basis from the expiration of the grace period until the time as the default is in fact cured.

(6)      Except as otherwise provided by law, Purchaser expressly agrees to give Seller priority and rights over any other creditor with respect to any outstanding amounts owed under this Agreement. Further, all leases, service agreements or other agreements assigned or transferred to the Purchaser pursuant to this Agreement or entered into by Purchaser (including its affiliates, successors or assigns) subsequent to this agreement shall be pledged as security or collateral for amounts owed to the Seller pursuant to this Agreement.

4.     ESCROW, INSPECTION PERIOD AND RELATED PROVISIONS.

(a)     The Contract Deposit being paid at the signing of this Agreement shall be held in escrow by the Escrowee until the Closing or returned to Purchaser pursuant to the terms of this Agreement, in an interest bearing account. If for any reason the ~~closing~~ Closing does not occur and a dispute develops between the Seller and the Purchaser as to the proper disposition of the escrowed funds, the Escrowee may

5

continue to hold such amount until otherwise directed by written instructions of all parties or final judgment of a Court, or, at the option of the Escrowee, the Escrowee may deposit such amount with an appropriate Court and, after giving written notice of such action to the parties, Escrowee shall have no further obligations with respect to such amounts.   The Parties hereby jointly and severally agree to indemnify and save the Escrowee harmless from any and all loss, damage, claims, liabilities, judgments and other costs and expenses of every kind and nature which may be incurred by the Escrowee by reason of its acceptance of, and its performance under this Agreement (including, without limitation, attorneys' fees either paid to retained attorneys or amounts representing the fair value of legal services rendered to itself). The obligation to reimburse the Escrowee for legal fees shall include, but not be limited to, reasonable attorney's fees incurred in connection with depositing the escrowed funds in Court, or with any other governmental agency, instituting an interpleader or other action, or representing the Escrowee, in connection with any action relating to this Agreement, the escrowed funds, or the underlying transactions, in which Escrowee is named a party. Escrowee is hereby authorized to pay outside retained counsel from the escrowed funds all amounts due to the Escrowee's attorneys under this paragraph.   Escrowee shall not be liable for any handling of the escrow funds except for willful disregard of the provisions of this Agreement. Escrowee may assume that any person purporting to give him any notice on behalf of any party in accordance with the provisions hereof has been duly authorized to do so and, may further assume, without further inquiry, that any signature on any document delivered to him is genuine. Escrowee may act or refrain from acting in respect to any matter referred to herein in full reliance upon and by and with the advice of counsel which may be selected by it (including any member of any law firm with which Escrowee may have an affiliation) and shall be fully protected in so acting or refraining from acting upon the advice of such counsel. Furthermore, Escrowee has the right to select an attorney to represent its interest should the need so arise including any member of any law firm with which Escrowee may have an affiliation.

(b)     Intentionally Left Blank

4.1     Purchaser will promptly after Seller's attorney has confirmed that he has in his possession executed copies of the documents set forth in Exhibits 3 and 9 of the Agreement, which should

6

be confirmed within sixty (60) days after the date of this Agreement undertake at its own expense to seek licensure to operate a 427 bed adult home, including a 122 bed Assisted Living Program (hereinafter "ALP") facility, issued pursuant to laws of State of New York by Public Health Council, which will be transferred to Purchaser from Seller. The legal expense in obtaining the approval will be borne by Purchaser.

       4.2      Within sixty (60) business days of the signing of this Agreement, the Seller shall deliver to the Seller's attorney the assignment, consents and guaranty identified and attached to this Agreement as **Exhibits 3** and **9**, respectively, duly executed by the appropriate parties to render such agreements enforceable and binding Seller's attorney shall notify Purchaser's attorney within two days (2) of receipt of the assignments and consents. These assignments and consents shall be held in escrow until such time as they may be released pursuant to this Agreement.

       5.      CLOSING DATE AND ADJUSTMENTS.

       5.1      Insofar as Purchaser may need time to complete this purchase, the closing under this Agreement (the "Closing") shall take place at 10:00 A.M. on either the last day of the month in which the State of New York Department of Health grants its approval to the Purchaser's application for the licenses set forth in **Exhibit 1**, including the ALP license, or the last day of the month directly following the month that the State of New York Department of Health grants its approval to the Purchaser's license application, at the office of the Purchaser's attorney, Mendel Zilberberg and Associates, P.C., 6619 Thirteenth Avenue, Brooklyn, New York 11219, or at the offices of the lender's attorney. At the Closing, contemporaneously with the performance of Purchaser of its obligations to be performed hereunder, Seller shall deliver to Purchaser the following documents enumerated in subparagraphs (a) - (k) (collectively referred to in this Agreement as the "Closing Documents"):

       a) a Bill of Sale, as set forth herein and made a part hereof as **Exhibit 2**;

       b) a duly executed Lease Assignment and Assumption, assigning the lease, as amended, between Hilmoor Associates and Henderson Hill Adult Home ALP, Inc. f/k/a Anna Erika Home for Adults, from Henderson Hill Adult Home ALP to Island Manor, Inc., a not for profit corporation, as set forth herein and made a part hereof as **Exhibit 3**;

7

c) a duly executed Assignment of the Lease, as amended, between Anna Erika Home for Adults and Sisters of Charity Health Care System, a type B not for profit corporation, assigned from Anna Erika Home for Adults a/k/a Henderson Hill Adult Home ALP, Inc., to Island Manor, Inc., a not for profit corporation, as set forth herein and made a part hereof as **Exhibit 4**;

d) a duly executed Assignment of the Lease, as amended, between Anna Erika Home for Adults and Sisters of Charity Medical Center, a type B not for profit corporation, assigned from Anna Erika Home for Adults a/k/a Henderson Hill Adult Home ALP, Inc., to Island Manor, Inc., a not for profit corporation, as set forth herein and made a part hereof as **Exhibit 5**;

e) a duly executed Assignment of the Service Agreement between Anna Erika Assisted Living Program and Sisters of Charity Home Health Care, Inc., from Anna Erika Home for Adults a/k/a Henderson Hill Adult Home ALP, Inc., to Island Manor, Inc., a not for profit corporation, its successors and/or assigns, as set forth herein and made a part hereof as **Exhibit 6**;

f) a duly executed Consent to the Assignment annexed hereto as **Exhibit 6** of this Agreement, by Sisters of Charity Home Health Care, Inc., as set forth herein and made a part hereof as **Exhibit 7**;

g) Intentionally left blank

h) Intentionally left blank.

i) Business records and information;

j) Documents and instruments necessary to effectuate this transaction and transfer to Purchaser title to the Purchased Assets, free and clear of all liens and encumbrances; and

k) a complete record of the Residents funds held in trust including but not limited to safekeeping and personal allowance accounts.

5.2     Adjustments to the Purchase Price shall be made as of the date of Closing, including but not limited to the following items: utilities, security deposits, telephone, employees' salaries, liability and other insurance (unless Purchaser obtains his own insurance).

8

6.      SALES TAX ON PURCHASED ASSETS.

This provision has been deleted and is not applicable in so far as the Purchaser is a not for profit corporation. To the extent any sales tax is owed it shall be paid by the Purchaser.

7.      REPRESENTATIONS AND WARRANTIES.

7.1      Seller represents and warrants to Purchaser as follows:

(a)      Neither the execution nor delivery of this Agreement, or any other agreement executed in connection therewith, nor the consummation of the transaction contemplated herein, will conflict with, or result in a breach of any of the terms, conditions or provisions of, or result in the termination of or constitute a default under any other contract or agreement to which Seller is a party, or is subject to.

(b)      Seller's corporation is duly organized, validly existing and in good standing under the laws of the State of New York and is duly qualified to do business in the State of New York, and has full power and authority to carry on its current Business and to own, use and sell its assets and properties.

(c)      The execution and delivery of this Agreement to Purchaser and the carrying out of the provisions hereof have been unanimously authorized by Seller's shareholders and Boards of Directors.

(d) Except as provided in **Exhibit 8**, unless expressly agreed to by the Purchaser, Seller will not enter into any contracts or commitments after the date of this Agreement which extend beyond the closing date.

(e) Seller has filed with the appropriate governmental agencies all tax returns required to be filed by it. Seller has paid all taxes, assessments, fees and other governmental charges levied upon its assets and income, other than those not yet due and payable.

(f) Except as attached in **Exhibit 10**, there are no known suits or actions, or legal, administrative, arbitration or other proceedings affecting this transaction or relating to the Purchased Assets, pending or, to the knowledge of Seller, threatened against Seller which might materially or adversely effect the financial condition of Seller or the conduct of Seller's business. Seller further

9

represents that there are no outstanding judgments, decrees or orders against Seller which affects Seller in any way.

(g)     Intentionally put in and left blank.

(h)     Seller has and will have all requisite power, authority, and capacity to enter into this Agreement and perform its obligations hereunder.

(i)     Neither the execution nor delivery of this Agreement, nor the consummation of the transactions contemplated herein, will conflict with, or result in a breach of any of the terms, conditions or provisions of any other agreement to which Seller is a party or is subject to.

(j)     The equipment is and will be in working order at the time of the Closing.

(k)     Seller will convey good and marketable title to the Purchased Assets.

(l)     Seller's principals shall give to Purchaser an affidavit, in the form annexed hereto as **Exhibit 9**, assuming the liability for the accuracy of the accounting of all Residents' funds and Residents' personal allowance accounts.

    i.     Seller's principals shall remain liable for the accuracy of Residents' accounts at the time of Closing.  This provision shall survive the Closing.

    ii.    Seller and Seller's principals shall give to Purchaser an affidavit, in the form annexed hereto as **Exhibit 9**, setting forth that all payroll, health and welfare obligations and pension obligations, whether or not due at the date of the closing have been paid up to the date of closing.  To the extent that it is later determined that there is any money due and owing attributable to the time period prior to the closing the Seller and its principals individually will remain liable for said sums. This provision shall survive the closing.

(m)     At Closing, Seller shall represent that since Purchaser entered into this Agreement, there have been no:

    i.     material transactions not in the ordinary course of Seller's business;

10

    ii.  changes to Seller's accounting methods or practices including

     any change in depreciation or amortization policies or rates;

    iii.  sale or transfer of Seller's assets or any cancellation of any

claims or contracts;

    iv.  events or conditions of any character which materially and

     adversely affects the Seller's Assets or business of Seller.

7.2  Purchaser represents and warrants to Seller as follows:

Neither the execution nor delivery of this Agreement, or any other agreement executed in connection therewith, nor the consummation of the transaction contemplated herein, will conflict with, or result in a breach of any of the terms, conditions or provisions of, or result in the termination of or constitute a default under any other agreement to which Purchaser is a party, or is subject to. Further, Purchaser agrees and covenants that it reasonably believes that it will receive necessary financing for its obligations under this Agreement.

8.  TITLE AND LEGAL.

Intentionally left blank

9.  COVENANTS.

  (a)  Seller covenants and agrees that until the Closing, unless otherwise agreed to in writing by Purchaser:

    i.  Seller shall not engage in or enter into any transaction, contract or commitment, or incur any liability or obligation not in the ordinary course of business that extend beyond Closing date except those contracts or agreements that may be canceled upon fifteen (15) days notice by Purchaser.

    ii.  Seller shall carry and continue in force through the Closing, such fire and extended coverage insurance, and theft, liability and other insurance as is presently existing.

    iii.  Seller shall not amend, modify or terminate any agreement to which it is a party, without Purchaser's consent except those Agreements that may be canceled upon fifteen (15) days notice by Purchaser.

11

iv.    The Business shall be carried on in its ordinary course that includes the management of a Home for Adults, as well as ancillary operations and appropriate subleases.

v.    Seller will cooperate with purchaser during the contract period. Purchaser will have access to the premises and the operation therein, by giving notice to Seller.

10.    LEASE.

10.1    Seller shall promptly notify the Landlord of the proposed assignment of the lease to Purchaser, and shall request the consent of the Landlord thereto.  Seller and Purchaser shall furnish to the Landlord such information as may reasonably be required in connection with the procuring of such consent, and shall otherwise cooperate with the Landlord and with each other in an effort to expeditiously procure such consent.

10.2    Seller promptly shall notify Sisters of Charity Health Care System, Sisters of Charity Medical Center, and Sisters of Charity Home Health Care, Inc. (collectively referred to herein as "Sisters") of the proposed assignment of the subleases and the service agreement to Purchaser, and shall request the consent of Sisters thereto.  Seller and Purchaser shall furnish to Sisters such information as may reasonably be required in connection with the procuring of such consent, and shall otherwise cooperate with Sisters and with each other in an effort to expeditiously procure such consent.

10.3    In the event that the Landlord does not consent to the assignment(s) relating to this transaction, Seller will use his best efforts including negotiation and litigation and ensure that Landlord approves the assignment.

10.4    11.    ASSIGNMENT OF CONTRACT.

This Contract may be assigned without the written consent of Seller, to a newly formed entity, provided that Willy Beer and/or Charles Scharf are principals in the new entity. However this contract can not be assigned to an entity that is not the licensed entity as provided herein without the prior written consent of Seller. ✗

12.    BROKER.

*if the Purchaser sells its' majority interest in the facility, the purchase price of this Agreement and any then Amounts due and payable to the Seller shall be due in its entirety immediately on the closing of said transaction. Provided however, the Seller may, in its discretion agree to a longer time period in which to accept any Amounts due and payable*

The parties represent to each other that they have dealt with no broker or finder with respect to this Agreement, except for Prestige Group, 321 S. Valley Forge Road, Devon, Pennsylvania 19333 (hereinafter referred to as the "Broker"). The Seller and the Broker have entered into a separate agreement pursuant to which the Seller shall be obligated to pay to Broker the Broker's fees in relationship to this transaction. At the Closing, Seller will deliver a release from the Broker for any obligation it may have to the Broker relating to this transaction.

13.     RISK OF LOSS.

The Seller assumes all risks of loss, damage or destruction to any Premises and or Facility or other property covered by this Agreement resulting from fire or other casualty up to the time of Closing. Purchaser shall have the right to terminate this Agreement if the Business is curtailed or interrupted prior to the Closing by loss, destruction or damage due to fire or other casualty. Upon notice to the Seller and the Escrowee of such termination, the Escrowee shall pay over to the Purchaser the Contract Deposit held by the Escrowee, who shall thereupon be discharged from all liability for said purchase money and the rights of the parties hereto resulting from this Agreement shall also terminate.

14.     MISCELLANEOUS.

14.1     This Agreement shall be binding upon the heirs, executors, administrators and legal representatives of the parties hereto.

14.2     The failure of any party at any time to require performance of any other party of any provision hereof or to resort to his or its remedy at law or in equity or otherwise, shall in no way affect the right of such party to require such full performance or to resort to such remedy at any time thereafter, nor shall the waiver by any party of the breach of any provision hereof be taken or held to be a waiver of any subsequent breach of such provision unless expressly so stated in writing. No waiver of any of the provisions hereof shall be effective unless in writing and signed by the party to be charged therewith.

14.3     All notices which any party hereto is required to or desires to send to another party, shall be delivered in person or mailed by certified mail, return receipt requested, and, if mailed, shall be deemed to have been given three (3) days following the date of the posting of the mail, to the party at his or its

address as it appears on the first page of this Agreement or at such address as may be designated by the parties, from time to time, by notice in accordance with this subsection.

Notice to the Purchaser shall be delivered to Purchaser's attorneys, Mendel Zilberberg & Associates, P.C., 6619 Thirteenth Avenue, Brooklyn, New York 11219.

Notice to the Seller shall be delivered to Seller's attorney, Sean Doolan, Esq., Hinman Straub, 121 State Street, Albany, New York 12207.

14.4   If any portion or provision of this Agreement shall to any extent be invalid or unenforceable, the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and be enforceable to the fullest extent permitted.

14.5   This Agreement shall be governed by the laws of the State of New York.

14.6   This Agreement and the closing documents may be recorded with the county clerk's office of Richmond County.

14.7   This Agreement and the exhibits hereto contain the full understanding of the parties with respect to the subject matter hereof and there are no representations, warranties, agreements or understandings other than expressly contained herein or therein.  No termination, alteration, modification or variation or waiver of this Agreement or any of the provisions hereof shall be effective unless in writing and executed by the parties hereto, or in the case of a waiver, by the party or parties waiving compliance.

14.8   Intentionally left blank.

14.9   The headings and captions under the paragraphs of this Agreement are for convenience and reference only and do not in any way modify, interpret or construe the intent of the parties or the effect of the provisions of this Agreement.

14.10   This Agreement may be executed in counterpart and each counterpart shall be considered as an original.

14

14.11    Each party covenants and agrees that he will execute and deliver such further documents as shall be reasonable required to carry out the purpose of this Agreement.

14.12    This Agreement is subject to the Purchaser obtaining authorization from the New York State Department of Health to operate the Premises as an adult care facility.

IN WITNESS WHEREOF, this Agreement has been made and executed as of the date and year first written above.

> Henderson Hill Adult Home ALP, Inc.
> f/k/a Anna Erika Home for Adults
>
> By: _____
>
> Island Manor, Inc.,
> a not for profit New York corporation
>
> By: _____

15

**EXHIBIT E**

## GUARANTY

GUARANTY, given February _____ 2003, by Willy Beer residing at 1200 East 8th Street, Brooklyn, NY 11230 and Charles Scharf residing at 953 East 22nd Street, Brooklyn, NY 11210 and having its principal place of business c/o Mendel Zilberberg & Associates, P.C., 6619 Thirteenth Avenue, Brooklyn, New York 11219.

## WITNESSETH

WHEREAS, concurrently herewith Henderson Hill Adult Home ALP, Inc.(the "Seller") is entering into a certain Purchase Agreement (the "Agreement") with Island Manor, Inc., a corporation, ("Purchaser"), of a business located at 110 Henderson Avenue in the City of New York, Borough of Staten Island; and

WHEREAS, in order to induce the Seller to enter into the said Agreement, the Guarantor(s) has agreed to give the Guaranty of the obligations of Purchaser under said Agreement.

NOW THEREFORE, in consideration of Ten Dollars, and other valuable consideration, the receipt and sufficiency of which hereby acknowledged, the parties hereto agree as follows:

1. The Guarantor(s) does hereby unconditionally guaranty to the Seller the payment of all amounts due under Article 3 of the Agreement by Purchaser and all extensions or renewals thereof,(the "Obligations"). The Obligations of the undersigned under this guaranty shall be limited to $300,000.00 pursuant to Article 3 of the Agreement and further limited to all amounts due from Purchaser until the time that the Purchaser relinquishes control to the Seller.

2. This Guaranty is irrevocable, continuing, indivisible and unconditional and, except as otherwise provided herein, may be proceeded upon by Seller obtaining a final non appealable judgment against Purchaser.

3. The Guarantor(s) represents and warrants that the Guarantor(s) has full power and authority to execute, deliver and perform this Guaranty, and that neither the execution, delivery nor performance of the Guaranty will violate any law or regulation, or any order or decree of any court or governmental authority, or will conflict with, or result in the breach of, or constitute a default under, any agreement or other instruments to which the Guarantor(s) is a party or by which Guarantor(s) may be bound, or will result in the creation or imposition of any lien, claim or encumbrance upon any property of Guarantor(s).

4. This Guaranty may not be changed or terminated orally. No modification or waiver of any provision of the Guaranty shall be effective unless such modification or waiver shall be in writing and signed by the Seller, and the same shall then be effective only for the period and on the conditions and for the specific instances and purposes specified in such writing.

5. This Guaranty shall be construed in accordance with, and governed by, the laws of the State of New York.

6. This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns.

IN WITNESS WHEREOF, the Guarantor(s) has given and executed the Guaranty on the date first above written.

In the presence of:


_____          _____
Charles Scharf                            Willy Beer

STATE OF NEW YORK, COUNTY OF                                    ,SS.:

      On the      day of         ,2003, before me personally came _____, to me known to be the individual described in, residing at _____ and who executed the foregoing instrument, and acknowledged that he executed said instrument.

                           _____
                               Notary Public
                        My commission expires on

STATE OF NEW YORK, COUNTY OF                                    ,SS.:

      On the      day of         ,2003, before me personally came _____, to me known to be the individual described in, residing at _____ and who executed the foregoing instrument, and acknowledged that he executed said instrument.

                           _____
                               Notary Public
                        My commission expires on

**EXHIBIT F**

## MEMORANDUM

TO:          ISLAND MANOR, INC.

FROM:        HENDERSON HILL ADULT HOME ALP, INC.

DATE: FEBRUARY _14_ 2003

This is to further advise about clarifications made to the Purchase Agreement Dated February _13_ 2003;

1. To the extent that this memo conflicts with any printed provisions of the Purchase Agreement signed between the parties on February ___, 2003 (hereinafter the "Agreement"), this memo shall control.

2. Upon initial licensure, if there is a permanent licensure reduction below 300 adult home beds and/or 122 Assisted Living Person ("ALP") beds, Purchaser may cancel this Contract.

Henderson Hill Adult Home ALP, Inc.
f/k/a  Anna Erika Home for Adults

By: _____

Island Manor, Inc.

By: _____

1

**EXHIBIT G**

## BILL OF SALE

BE IT KNOWN, for one dollar and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, the undersigned (the "Seller") sells, assigns and conveys to Island Manor, Inc., a not for profit corporation, and its successors and assigns forever, the following described property:

All intangible personal property owned by Seller and used in connection with the Premises, including but not limited to Seller's goodwill and reputation in the community, the trade name Henderson Hill Adult Home ALP, Inc. and/or Anna Erika Home for Adults, and its variations, leaseholds, service agreement, insurance policies, telephone numbers and listings, machinery, equipment, computer equipment, furniture, supplies, medical equipment, bedding, fixtures and leasehold improvements, residents list; permits, licenses, contract rights and general intangibles relating to the Premises and Facility, and inventory.

Seller sells and transfers only the right, title and interest as it may hold, and that these chattels sold are sold subject to any required State approval, prior liens, encumbrances, adverse claims, if any, that may exist, and Seller disclaims any and all warranties.

These assets are further sold in working condition and where presently located.

Signed under seal this ___ day of June, 2002.

Henderson Hill Adult Home ALP, Inc.
f/k/a Anna Erika Home for Adults,
Seller

By _____

Island Manor, Inc.,
Purchaser

By _____

**EXHIBIT H**

## CONSENT TO ASSIGNMENT OF LEASE

Whereas Broadmoor Enterprises Corp. and Anna Erika Home for Adults Associates, entered into a lease agreement dated January 30, 1976, covering the premises located at 110 Henderson Avenue, Staten Island, New York 10301 (hereinafter referred to as the "Main Lease"). The Main Lease was assigned by Broadmoor Enterprises Corp. to Hilmoor Associates, a partnership, (hereinafter referred to as the "Landlord") by means of an Agreement dated August 29, 1980. The Main Lease was renewed by means of a Renewal Agreement dated January 25, 1996, and amended by an Amendment Agreement dated November 2, 1997. Effective June 1, 1998, the Main Lease as amended was assigned to Henderson Hill Adult Home ALP, Inc. (hereinafter referred to as the "Tenant").

Whereas Tenant desires to assign all of its rights, title, and interest in and to the Main Lease as amended to Island Manor, Inc., its successors and/or assigns, (hereinafter referred to as the "Assignee"), and the Assignee desires to assume the Main Lease as amended

Therefore, it is stipulated and agreed as follows:

1.    Landlord consents to the assignment of the Main Lease as amended from Henderson Hill Adult Home ALP, Inc. f/k/a Anna Erika Home for Adults, to Island Manor, Inc., a not for profit New York Corporation, its successors and/or assigns (the "Purchaser" or "Assignee"), under the same terms and conditions as mentioned and described in the Main Lease as amended.

2.    Except as modified by this assignment, all terms of the Main Lease as amended remain in full force, and are binding on Landlord, Tenant and Assignee, accordingly.

3.    This consent will bind and inure to the benefit of the parties and their respective heirs, legal representatives, successors, and assigns.

4.     Provided however, any personal liability of the Tenant provided for in the Main Lease as amended shall continue, to the extent limited therein, until such time as the purchase price provided for in the Purchase Agreement between the Tenant and Purchaser (dated February 13, 2003) is fully paid and satisfied. On the date in which the Tenant has received full payment and satisfaction of the purchase price contained in said Purchase Agreement, any liability or obligations, personal or otherwise, of the Tenant or its' principals will cease. Thereafter and until the end of the Main Lease as amended, Willy Beer and Charles Scharf, in their individual capacity, guarantee all obligations set forth in the Main Lease as amended until June 30, 2016.

Dated _July 2, 2003_

Hilmoor Associates

By: _[signature]_

Hederson Hill Adult Home ALP, Inc.
f/k/a Anna Erika Home for Adults

By: _[signature]_

Island Manor Inc.

By: _[signature]_

The undersigned, Willy Beer and Charles Scharf do enter into the personal guarantee as set forth in paragraph four (4) above.

Willy Beer

_[signature]_

Charles Scharf

_[signature]_

2

**EXHIBIT I**

223049
6/10/03

# MANAGEMENT SERVICES AGREEMENT

MANAGEMENT SERVICES AGREEMENT made as of June 16, 2003 by and between Henderson Hill Adult Home ALP, INC. ("Operator"), with a place of business at 110 Henderson Avenue, Staten Island, NY 10301, and Island Manor, Inc.("Manager"), with a place of business at 20 West 72nd Street, New York, NY 10023.

## RECITALS:

A.      Operator owns and operates a 427 bed Home for Adults located at 110 Henderson Avenue, Staten Island, NY 10301 (the "Facility") pursuant to a license issued to it by the New York State Department of Health) (the "Department").

B.      Manager is in the business of providing management services to adult home facilities and other entities.

C.      Operator and Manager now desire that Operator retain Manager to provide management services to the Facility, pursuant to the terms of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

1.      Preamble.  All of the statements contained in the preamble are incorporated herein with the same force and effect as if herein set forth at length.

2.      Appointment of Manager.  Operator hereby engages Manager, and Manager hereby accepts such appointment, as manager of the Facility, on behalf of Operator, commencing July 1, 2003.

3.      Duties of Manager.  Operator hereby confers upon Manager authority in the management of the Facility, subject to the supervision of Operator, as follows:

3.1      Manager shall hire, pay, supervise and discharge, in its name, all persons necessary in order to properly maintain and operate the Facility in accordance with all applicable law, as a Home for Adults.  Manager's services shall include supervision of payroll and payment of all payroll taxes.  Current employees of the Facility will be transferred to Manager as of July 1, 2003.  Anything to the contrary herein contained notwithstanding, Operator retains the right to discharge any employee of the Facility or any other personnel working at the Facility.  Any action by the Manager to terminate a Operator employee will be done in consultation and coordination with Operator and in accordance with Operator policies and procedures.

3.2      In the name of and on behalf of Operator, Manager shall bill residents for maintenance and other charges and use its best efforts to collect same;

set and file for all rate structures; apply for all increases in rates as and when available. Operator hereby authorizes Manager to ask for, demand, sue for, collect and receive any and all billing and other charges for maintenance which may at any time be or become due to Operator from any resident or other person or governmental agency with respect to the Facility and to institute such legal action as may be necessary in Operator's name, and to employ and arrange for the payment of counsel, if necessary, for any such purpose. The Manager acknowledges that no residents of the Facility will be discharged due to payor status and that no residents will be discharged from the Facility other than through normal attrition. Operator represents that there are no residents for whom maintenance and other charges are not presently being paid on a current basis.

3.3    Manager shall cause the Facility's building to be properly maintained in such condition in accordance with applicable laws governing the operation of the Facility as in Manager's judgment may be advisable, including interior and exterior cleaning and cause repairs and alterations thereof that Manager may deem proper and/or required by all governmental agencies for the efficient and expeditious running of the Facility.

3.4    Manager shall consider and attend to all complaints of residents.

3.5    From and after the effective date of this Agreement, Manager shall file in Operator's name, as manager, all reports, requests and documents required and authorized pursuant to all applicable governmental agencies and regulations having jurisdiction over the operation of a Home for Adults. It is understood and agreed that no such reports, statements, and/or documents shall be submitted to the Department unless and until the same have first been submitted to Operator for review and until the same have been approved by Operator.

3.6    Manager shall make contracts for electricity, gas, fuel, telephone, security protection, extermination, and all other services, as applicable, all in the name of Manager. Manager shall arrange utility readings through June 30, 2003, and final billings to Operator. Manager shall also purchase all supplies necessary to properly maintain and operate the Home for Adults in accordance with the standards required by governmental agencies. Operator represents that it has not received any notice of a desire by any person to have any employee or group of employees become members or a union.

3.7    Manager shall order all signs, renting plans, price lists, booklets, circulars and advertising which may be required in connection with obtaining residents for the Facility.

3.8    Manager shall, from time to time as appropriate, retain and employ such professional or other experts, chargeable to the operation, whose services may be reasonably required to effectuate the duties and powers herein.

3.9    Manager shall cause to be performed such acts and things to be done in or about the Facility as may be necessary to comply with any and all orders,

regulations or notices affecting the Facility issued by any federal, state or municipal agency having jurisdiction thereof. Manager shall provide all information required by the Department and shall cooperate with the Department in carrying out inspections and enforcement activities pursuant to 18 NYCRR Section 485.10(a)(4)(ix), and shall promptly respond to all corrections required by the Department after each inspection and assist Operator in responding to all enforcement activities.

3.10    Manager shall pay all third party bills in connection with the day-to-day operations of the Facility with respect to the term of this Agreement, as well as all third party invoices based upon contracts (service or otherwise), and all other out of pocket expenses, ordinary or extraordinary, relating to the operation of the Facility with respect to the term of this Agreement ("Operating Expenses"). Operating Expenses shall not include any costs, liabilities, debts or other expenses relating to the period prior to July 1, 2003 or current service of long term debt. While Operator may, in its discretion, incur any expense relating to the Facility that it deems appropriate, any cost, liability, debt or other expense relating to the Facility incurred by Operator without the prior consent of Manager shall not be deemed an Operating Expense, shall be paid directly by Operator and shall not be charged to the special account provided in section 4 (such amounts as are provided in this section 3.10 as not being Operating Expenses being herein "Outside Expenses").

3.11    Manager's designee and a representative of Operator shall each be named a signatory on the accounts maintained by Operator for resident funds and personal allowance accounts. Such accounts shall be maintained in the name of Operator, for the benefit of the residents, all in accordance with the rules and regulations of the Department.

3.12    Manager shall maintain the premises in a manner to satisfy the requirements of the Department.

3.13    Manager shall report regularly to the Operator Executive Committee and Board of Directors, and will provide monthly operational reports and financial statements to Operator by the 10th day of the following month (or, if not a business day, the next following business day).

Any powers and duties not herein above specifically delegated to the Manager remain with Operator.

4.    Special Account.  Manager shall deposit all funds collected from the operation of the Facility into a special bank account or accounts in the name of Operator. Manager's designee and a representative of Operator shall each be named a signatory on such special bank account(s). All Operating Expenses of the Facility shall be paid from such special bank account(s), including the Manager's fee as set forth in section 10, provided that if Manager pays any Outside Expenses from such special bank account(s), then Operator shall reimburse such amounts. Such accounts and records of such collections and disbursements shall be maintained in accordance with prevailing accounting standards, to be kept at the office of Manager in the Facility.

3

5.   _Authorization._  Operator hereby authorizes Manager to perform any act or do any thing necessary or desirable to carry out Manager's duties and responsibilities contained in section 3 hereof, provided that all actions taken by Manager pursuant to the provisions of section 3 shall be done in the name of Operator (except as provided in section 3) and for its benefit.

6.   _Indemnification._

6.1   Operator hereby indemnifies and saves Manager harmless from any and all claims, liability, tax obligations, actions of all kinds, nature and description arising from or in connection with the operation of the Facility or relating to employees of the Facility for all periods prior to the commencement of this Agreement.

6.2   Manager agrees to indemnify and save Operator harmless from any and all claims, actions of any kind, nature or description arising out of or in connection with Manager's activities at the Facility during the period of this Agreement.

7.   _Insurance._

7.1   Throughout the term of this Agreement, Manager will maintain (1) a general liability insurance policy, covering bodily injury (including death) and property damage at the Facility, (2) a medical malpractice (professional liability) insurance policy and [(3) an errors and omissions insurance policy], each in a minimum amount of [One Million Dollars ($1,000,000.00)] each occurrence and [Two Million Dollars ($2,000,000.00)] in the aggregate.  Manager will give Operator fifteen (15) days notice of any change or amendment to said insurance coverage.  Said insurance coverage will name Operator as an Additional Insured.

7.2   Notwithstanding section 7.1, Operator will advise Manager if its existing general liability insurance policy and medical malpractice (professional liability) insurance policy can be maintained and extended to Manager, and the cost therefore.  If such insurance can be so maintained, then, at Manager's election and cost (as if an Operating Expense), Operator shall so maintain such insurance.  Operator will give Manager fifteen (15) days notice of any change or amendment to said insurance coverage.

8.   _Term._  The term of this Agreement shall be for one (1) year commencing on July 1, 2003 and terminating on June 30, 2004 and renewable from year to year thereafter unless sooner terminated as hereinafter provided, by either party.

9.   _Events of Default, Remedies, and Rights of Termination._

9.1   If the Part I or Part II Application of Manager, or a related entity, is disapproved by the Department, Operator reserves the right to terminate this agreement upon 30 days written notice to the Manager, provided that this Agreement shall not be terminated if Manager assigns this Agreement as provided in section 15 during such 30 days.

4

9.2   Default by Manager.  If Manager defaults in the performance or observance of any of the terms, covenants, provisions and conditions contained in this Agreement or pursuant to the licensing provisions of the Department, Operator, including if Manager fails to account for all funds derived from the operation of the Facility, or any funds belonging to Operator, then Operator shall notify Manager in writing of the nature of said default and if, within ten (10) business days thereafter, Manager shall have failed to comply with or remedy such default, or if the said default shall be of a nature that the same cannot be completely cured or remedied within said ten (10) day period, and Manager shall not thereafter, with reasonable diligence and in good faith proceed to remedy or cure such default, Operator may then cure any such default and/or notify Manager that Operator has declared this Agreement terminated and canceled. Nothing herein contained shall be deemed to obligate Operator to cure Manager's default.

9.3   Insolvency of Manager.  If Manager is dissolved or liquidated, applies for or consents to the appointment of a receiver, trustee, or liquidator of all or a substantial part of its assets, files a voluntary petition in bankruptcy, makes a general assignment for the benefit of creditors, or files a petition or an answer seeking reorganization or arrangement with creditors or to take advantage of any insolvency law, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Manager bankrupt or insolvent or approving a petition seeking reorganization of Manager or appointing a receiver, trustee or liquidator for Manager or all or a substantial part of its assets, and such order, judgment or decree shall continue unstayed and in effect for any period of sixty (60) consecutive calendar days, then this Agreement shall automatically terminate.

9.4   Surrender of Premises.  Upon any termination of this Agreement, Manager shall promptly quit and surrender the premises and cooperate with Operator in an orderly return of the premises to Operator. Without limiting the generality of the prior sentence, employees of the Facility at the time of termination shall be transferred to Operator.

~~Management Fee.  Operator shall pay to the Manager a fee equal to~~ ~~such management fee for each calendar month shall be paid by the 15th~~ ~~calendar day of such month (or, if not a business day, the next business day).~~

11.   Department of Health Notices.  Manager undertakes and agrees to immediately forward to Operator copies of all notices, reports, and other correspondence received by Manager from the Department and to advise Operator of the appropriate action to be taken.

12.   Department of Health Inspections.  Manager shall advise Operator of each and every inspection made by any personnel of the Department within forty-eight (48) hours after the same has taken place, submit copies of the results thereof within forty-eight (48) hours of their receipt, correct any violations set forth therein and submit to Operator a copy of the Plan of Correction required to be filed with the Department prior to its submission, which plan shall be filed in the name of Facility.  Operator

represents that it has provided Manager with copies of the Facility's most recent inspection report and Plan of Correction, and further represents that all actions necessary or appropriate to correct any matters reported therein have been taken.

13.    Operator Inspections.  Operator shall be permitted to inspect the premises either in person or through Operator's agents or representatives, at any time.

14.    Compliance.  Manager shall at all times throughout the term of this Agreement comply with all applicable provisions of law and regulations.  Operator understands and acknowledges that as licensee, they remain responsible that the operations comply with all applicable laws and regulations.

15.    Assignment.  Manager may assign this Agreement to a substitute Manager approved by the Department, subject to the consent of Operator, which shall not be unreasonably withheld or delayed.  Without limiting what might otherwise be deemed reasonable in accordance with the prior sentence, if the Facility is subject to an enforcement proceeding by the Department at the time when Operator's consent is requested, its withholding of its consent until such proceeding is terminated shall be deemed reasonable.

16.    Independent Contractor.  Nothing contained in this Agreement shall constitute or be construed to be or to create a partnership or joint venture between Operator and Manager with respect to the Facility or any equity interest in the Facility on the part of Manager.  The relationship of Manager to the Facility under this Agreement is that of an independent contractor and neither party is the employee, employer, principal nor agent of the other.

17.    Miscellaneous.

17.1    Any notices or communications given by any party hereto to the other party shall be in writing and personally delivered or mailed by registered or certified mail, return receipt requested, or by nationally recognized overnight courier, to the addresses provided below.  Notices shall be deemed given when received.  Notices shall be delivered to the following addresses:

To Operator:                          To Manager:

Henderson Hill Adult Home ALP, INC.    Island Manor, Inc.
110 Henderson Avenue                  20 West 72nd Street
Staten Island, NY 10301               New York, NY 10023
Attn: Vincent Sirangelo               Attn: Willy Beer

6

with a copy to:

Hinman Straub
121 State Street
Albany, NY 12207
Attn: Sean Doolan, Esq.

with a copy to:

Wolf Haldenstein Adler Freeman & Herz
LLP
270 Madison Avenue
New York, NY 10016
Attn: M. Joshua Aber, Esq.

or to such other addresses as the parties may designate in writing. Refusal of a party to accept the notice or communication shall not affect the validity thereof, and if sent in accordance with the terms of this Agreement, such notice or communication shall be deemed given and valid in all respects.

17.2     This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and, where applicable, their assigns.

17.3     This Agreement represents the entire agreement between the parties regarding the subject matter hereof and supersedes in all respects any and all prior oral or written agreements or understandings between them pertaining to the subject matter of this Agreement. This Agreement cannot be modified or terminated, nor may any of its provisions be waived, except by a written instrument signed by the party(ies) against which enforcement is sought. Any waiver by any party of the strict performance of any of the terms, conditions and provisions of this Agreement shall not be construed as a waiver thereof for the future, but shall be considered a waiver only in the particular instance, for the particular purpose, and at the time when and for which it is given.

17.4     This Agreement has been made and entered into in the State of New York and shall be governed by and construed and enforced in accordance with the internal substantive laws of the State of New York.

17.5     Headings contained in this Agreement have been inserted for reference purposes only and shall not be considered part of this Agreement in construing this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date and year first above written.

Henderson Hill Adult Home ALP, INC          Island Manor, Inc.

By:_____          By:_____
Name:_____          Name:_____
Title: Partner          Title: President

7

**EXHIBIT J**

## MANAGEMENT AGREEMENT

AGREEMENT made the _____ day of June 2003, by and between Henderson Hill Adult Home ALP, Inc. ("Seller") and Island Manor, Inc. ("Purchaser").

WHEREAS, the aforementioned parties have entered into a purchase agreement dated February 13, 2003 ("Purchase Agreement"), for the sale of the business and other assets located at 110 Henderson Avenue, Staten Island, New York 10301 ("Premises"), as such business and assets are described in the Purchase Agreement; and

WHEREAS, the Seller desires to grant the Purchaser the managing rights of the business consisting of the operation of the Henderson Hill Adult Home f/k/a Anna Erika Home for Adults, as set forth in the Purchase Agreement (the "Business"); and

WHEREAS, the Seller desires to permit the Purchaser to enter and manage the Premises under certain circumstances,

NOW, THEREFORE, in consideration of ten dollars and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1. Effective July 1st, 2003 (the "Exercise Date"), the Seller will grant to the Purchaser the managing rights of the Business. Said rights will include, but not be limited by, the right to make all operational decisions, receive all profits, and be responsible for all expenses in the full daily operation of the Premises. Purchaser shall not make substantial capital improvements to the Business for more than $10,000.00, without consent from the Seller, which will not be unreasonably withheld.

2. Purchaser will pay Seller $650,000.00 on the Exercise Date by releasing the $250,000.00 escrow held in accordance with the Purchase Agreement, and the balance by check. Said payment will reduce the payment due by Purchaser at the closing by $650,000.00.

3. Additionally, the Purchaser will make monthly payments to the Seller of $71,296.30, starting August 15, 2003. The purchase price due by Purchaser at the closing will be similarly reduced by the monthly payments made by Purchaser under this agreement.

4. In exercising the right to manage the business, the Purchaser shall be given access to all financial, management and other records relating to the Business. The Seller's administrator will remain at her post after the Exercise Date in order to take care of any unfinished matters relating to the operation of the Business prior to the Exercise Date, as well as assist the Purchaser under this agreement.

5. Beginning on the Exercise Date, the Purchaser shall be liable for all debts, liabilities or expenses during the entire period in which the Purchaser manages the Business under this agreement, and such liability shall last until this agreement is terminated as provided herein. Any liability incurred and amounts owed to any party prior to the Exercise Date shall be the responsibility of the Seller.

6. Any income, revenues or profits accrued or earned on or after the Exercise Date until the end of the

management period shall be the property of the Purchaser. Any income, revenues or profits accrued or payable prior to the exercise date shall be the property of the Seller.

7.  The Seller shall continue, after the Exercise Date, to maintain ownership and title of the Business as provided in the Purchase Agreement and shall continue, at Purchaser's request, all insurance relating to the Business during the management period.

8.  This agreement shall be effective until the earlier of Purchaser obtaining all necessary licenses to operate the Business in accordance with the Purchase Agreement and the sale between the parties being finalized, the Purchaser is denied such licensure, or if the deal is not finalized for any of the contingencies contemplated in the Purchase Agreement.

9.  In the event this agreement terminates for any reason other than the finalization of the transaction as specified in the Purchase Agreement, Seller will pay the Purchaser the amount of $650,000.00, minus all profits after taxes made by Purchaser during the management period. If the Purchaser has not profited $650,000.00 after taxes at the time of the termination and Seller has not refunded to Purchaser $650,000, this agreement will be effective until the Purchaser has obtained $650,000.00 in profits after taxes.

10. In the event the agreement terminates for any reason other than the finalization of the transaction as specified in the Purchase Agreement, the Purchaser will be entitled to a payment of $10,000.00 per month for management, which will be paid in addition to the $650,000.00 indicated in Paragraph 9.

11. If Purchaser fails to make any of the payments required to the Landlord or the Seller under the agreement dated February 13, 2003 such payments may be made by Seller. The amounts expended by Seller to make those payments shall be deducted from the $650,000 due to Purchaser.

12. All adjustments under the Purchase Agreement will be as of the Exercise Date.

13. This Agreement shall be governed by the terms and conditions of the Purchase Agreement. To the extent any portion of this agreement is inconsistent with or conflicts with any provision of the Purchase Agreement, the provisions of this Agreement shall apply.

14. The Seller has the right to cancel this agreement if there is a showing of fraud, malfeasance or willful neglect in the management of the Business by Purchaser.

15. This Agreement shall be binding upon the heirs, executors, administrators, and assigns of the parties hereto.


IN WITNESS WHEREOF, this Agreement has been made and executed as of the date below.


HENDERSON HILL ADULT HOME, ALP


BY: DATE:


ISLAND MANOR, INC.

**EXHIBIT K**



The
PRESTIGE
GROUP, INC.
REALTORS®

- Industrial
- Commercial
- Land Development
- New Homes Marketing
- Investment Property

Re:    Henderson Hill Adult Home Inc. T/A Anna Erika

This will confirm the Agreement between the Seller and Prestige Group that Prestige Group, Inc. is to receive a sale commission of $250,000. Prestige Group, Inc. will establish an escrow account at Royal Bank of Pennsylvania with joint signatures of Richard Natow and Sean Doolin for the escrow of $50,000 on July 2, 2003 as a partial payment of the total commission of $250,000. The escrowed amount of $50,000 is to be released and the remaining $200,000 is to be paid to Prestige Group at the time of final settlement and sale of assets.

In the event the sale is not completed the $50,000 escrow will be released to the Buyer.

Richard Natow

Vince Strangelo

HOME BUILDERS ASSOCIATION OF
CHESTER & DELAWARE COUNTIES

321 S. Valley Forge Road, Devon, PA 19333   610·902·3900   Fax 610·902·3999

**ANNA ERIKA ASSISTED LIVING**
110 HENDERSON AVENUE
STATEN ISLAND, NY 10301

3365

PAY TO THE
ORDER OF _PRESTIGE as Escrow Aeeta_                July 2 2003                 1-8/210

_Fifty Thousand $_                                              $ 50000 00

**CITIBANK, N.A.**                                              00
BRANCH 396                                                            DOLLARS
445 FOREST AVE.
STATEN ISLAND, NY 10301

FOR _____

⑈003365⑈ ⑆021000089⑆ 95632093⑈

**EXHIBIT L**

AGREEMENT

AGREEMENT made the ___26___ day of ~~May~~ JUNE 2006, by and between **HENDERSON HILL ADULT HOME ALP, INC.**, of 110 Henderson Avenue, Staten Island, New York (the "Seller") and **BAYWOOD, LLC**, a New York limited liability company having an address at c/o Mendel Zilberberg & Associates, 6619 Thirteenth Avenue, Brooklyn, New York (the "Purchaser").

**WHEREAS**, the aforementioned parties have entered into a purchase agreement dated February 13, 2003 ("Purchase Agreement"), for the sale of the business and other assets located at 110 Henderson Avenue, Staten Island, New York 10301, as such business and assets are described in the Purchase Agreement; and

**WHEREAS**, the parties hereto desire to set forth in writing a further agreement between them,

**NOW, THEREFORE**, in consideration of Ten Dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.  Seller hereby consents to the transfer without any restrictions whatsoever by Purchaser of Purchaser's rights and obligations under the Purchase Agreement, to either another entity (subject to DOH approval) or through a transfer of the membership interests and/or control of Baywood, LLC.

2.  Seller agrees and undertakes to assist Purchaser in any way possible to effectuate the transfer contemplated in this Agreement, including, but not limited to, negotiating with the state authorities, the transferee, and other parties, as required

1

by Purchaser.

3.    Seller agrees and undertakes to, if requested by Purchaser, ultimately sign any and all documents reflecting the transfer contemplated in this Agreement.

4.    Purchaser agrees that any assignment of the Purchase Agreement as contemplated herein, will contain a clause stating that if Purchaser's assignee fails to obtain DOH approval before December 31, 2006, said assignment will be automatically cancelled, and Purchaser shall be free to assign the Purchase Agreement to another assignee, unless Purchaser grants an extension to the original assignee.

5.    At the Closing, the amount due will be One Million Three Hundred Thousand Dollars ($1,300,000.00), of which Six Hundred and Fifty Thousand Dollars ($650,000.00) were already released to Seller, and Six Hundred and Fifty Thousand Dollars ($650,000.00) will be given as a cash payment at the Closing; plus monthly payments of One Hundred Thousand Dollars ($100,000.00) until and including June 2012, which payments include interest and expenses.

6.    The financial terms detailed in this Agreement constitute the totality of the amounts due for the transaction contemplated in the Purchase Agreement, without any further financial obligations from Purchaser for said transaction.

7.    Seller acknowledges and agrees that even if Purchaser assigns its rights and obligations under the Purchase Agreement as contemplated herein, Purchaser will not withdraw its application for DOH approval until such time as Purchaser's assignee is approved by the DOH.

8.    This Agreement shall be binding upon the heirs, executors, administrators, and assigns of the parties hereto.

IN WITNESS WHEREOF, this Agreement has been made and executed as of the date

2

first written above.

**SELLER**                                          **PURCHASER**

HENDERSON HILL                                 BAYWOOD, LLC
ADULT HOME ALF, INC.
By: _____                          By: _____

Title: _____                       Title: _____


STATE OF NEW YORK        )
                          )
COUNTY OF  Nassau          )  ss.

On the 2C day of June , 2006, before me, the undersigned notary public, person-
ally appeared Vincent Sirangelo, personally known to me or proved to me on the basis of
satisfactory evidence to be the individual whose name is subscribed to the within instrument and
acknowledged to me that he/she executed the same in his/her capacity, and that by his/her
signature on the instrument, the individual, or the person upon behalf of which the individual
acted, executed the instrument.

_____                       SANDRA SCHECHTER
Notary Public                                   Notary Public, State of New York
My commission expires on:                       No. 01SC6068867
                                                Qualified in Nassau County
                                                Commission Expires Jan. 14, 20 10


STATE OF NEW YORK        )
                          )
COUNTY OF  Nassau          )  ss.

On the 2C day of June , 2006, before me, the undersigned notary public, person-
ally appeared Willy Beer, personally known to me or proved to me on the basis of satisfactory
evidence to be the individual whose name is subscribed to the within instrument and
acknowledged to me that he/she executed the same in his/her capacity, and that by his/her
signature on the instrument, the individual, or the person upon behalf of which the individual
acted, executed the instrument.

_____                       SANDRA SCHECHTER
Notary Public                                   Notary Public, State of New York
My commission expires on:                       No. 01SC6068867
                                                Qualified in Nassau County
                                                Commission Expires Jan. 14, 20 10


3

**EXHIBIT M**

## ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption Agreement (hereinafter referred to as the "Agreement") is entered into effective as of _JUNE 26_, 2006, by and between WILLY BEER and CHARLES SCHARF, of 1200 East 8th Street, Brooklyn, New York (collectively referred to herein as the "Assignor"), and DANIEL STERN, of _____ (the "Assignee").

### W I T N E S S E T H:

WHEREAS, Assignor owns the membership interests (the "Membership Interests") of a certain New York limited liability company known as BAYWOOD, LLC (the "LLC"); and

WHEREAS, Assignor desires to assign all of its right, title, and interest in and to the Membership Interests to Assignee; and Assignee desires to assume said Membership Interests and accept the assignment; and

WHEREAS, HENDERSON HILL ADULT HOME ALP, INC. (as Seller) and BAYWOOD, LLC (as Purchaser) entered into a purchase agreement (the "Purchase Agreement") dated February 13, 2003, for the sale of the business and other assets located at 110 Henderson Avenue, Staten Island, New York 10301, as such business and assets are described in the Purchase Agreement (the "Business"), a copy of which is annexed hereto as Exhibit 1, and incorporated herein for all purposes; and

WHEREAS, Seller has previously consented to this assignment in an agreement with Assignor dated ~~May~~ June 26, 2006, a copy of which is annexed hereto as Exhibit 2, and incorporated herein for all purposes.

NOW THEREFORE, in consideration of Ten Dollars ($10), the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is

hereby acknowledged and confessed, the parties agree as follows:

1.     The recitals set forth hereinabove are incorporated in this Agreement as if more fully set forth herein at length.

2.     Assignor hereby assigns, transfers, and conveys to Assignee, subject to the Department of Health's approval of Assignee's application, all of Assignor's right, title, and interest in and to the Membership Interests.

3.     Assignee hereby (a) accepts the assignment, transfer, and conveyance of all of Assignor's right, title, and interest in and to the Membership Interests; (b) assumes and agrees to perform and fulfill all of Assignor's covenants and obligations under the Purchase Agreement, including, without limitation, the obligation to promptly apply for the necessary governmental approvals, and make all payments due to or payable on behalf of Seller when due and payable; and (c) agrees to be bound by those covenants and obligations.

4.     In the event Assignee has not obtained DOH approval to operate the Business on or before December 31, 2006, Assignor, at its sole discretion, shall have the right to cancel this Agreement, in which case this Agreement will be considered null and void, and the parties will have no further obligations to each other. Upon the request of Assignee, Assignor shall have, at its sole discretion, the right to extend the period for Assignee to obtain DOH approval beyond December 31, 2006.

5.     Except as modified in this Assignment, all terms of the Purchase Agreement remain in full force and are binding on Seller, Purchaser, Assignor and Assignee.

6.     This Agreement may be executed in two or more counterparts, each of which will be deemed to be an original, but all of which will constitute one agreement.

7.     This Agreement will bind and inure to the benefit of the parties and their respective heirs,

legal representatives, successors, and assigns.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first written above.

ASSIGNOR

WILLY BEER

CHARLES SCHARF

ASSIGNEE

DANIEL STERN

STATE OF NEW YORK )
                        )
COUNTY OF Nassau )   ss.

On the 26 day of June , 2006, before me, the undersigned notary public, personally appeared Daniel Stern, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

SANDRA SCHECHTER
Notary Public, State of New York
No. 01SC6068867
Qualified in Nassau County
Commission Expires Jan. 14, 20 10

Notary Public
My commission expires on:

STATE OF NEW YORK )
                        )
COUNTY OF Nassau )   ss.

On the 26 day of June , 2006, before me, the undersigned notary public, personally appeared Willy Beer, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

SANDRA SCHECHTER
Notary Public, State of New York
No. 01SC6068867
Qualified in Nassau County
Commission Expires Jan. 14, 20 10

**EXHIBIT N**

*Payments to Sirangelo*

## AGREEMENT

AGREEMENT made the ___ day of June 2006, by and between VINCENT SIRANGELO, of 110 Henderson Avenue, Staten Island, New York ("Sirangelo") and DANIEL STERN, of _____ ("Stern").

WHEREAS, Sirangelo is paying all expenses regarding the withdrawal of Willy Beer and Charles Scharf's DOH application, and will be refunding all expenses incurred by Beer/Scharf in their application process to this date, and

WHEREAS, due to said withdrawal Sirangelo will need to be more involved with the Business; and

WHEREAS, the aforementioned parties desire to set forth in writing a certain agreement between them,

NOW, THEREFORE, in consideration of Ten Dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1. Upon assuming control of BAYWOOD LLC and obtaining DOH approval, Stern hereby agrees to pay Thirty Thousand Dollars ($30,000.00) per month to SIRANGELO ENTERPRISES until and including June 2012. This is in addition to the monthly payment of One Hundred Thousand Dollars ($100,000.00) made by BAYWOOD LLC to HENDERSON HILL ADULT HOME ALP, INC.

2. This Agreement shall be binding upon the heirs, executors, administrators, and assigns of the parties hereto.

IN WITNESS WHEREOF, this Agreement has been made and executed as of the date first written above.

1

VINCENT STRANGELO

DANIEL STERN

2

3